May 24, 2006

Honorable Denise L. Cote
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re:**    *United States of America v. Rudaj*
*S3 04 Cr. 1110 (DLC)*

Dear Judge Cote:

　　This sentencing memorandum is respectfully submitted on behalf of Alex Rudaj who is scheduled to be sentenced by Your Honor on  June 16, 2006.

　　On January 4, 2006, after a fourteen week trial, Mr. Rudaj was convicted of the following counts as charged in the above captioned indictment;

Count One; Racketeering[1]
Court Two; Racketeering Conspiracy
Count Three; Assault in Aid of Racketeering (Salvatore Misale)
Count Five; Illegal Gambling Conspiracy
Count Six; Illegal Gambling Business
Count Nine; Extortion Conspiracy (Mirage)
Count Ten; Attempted Extortion (Mirage)
Count Eleven; Conspiracy to Use Extortionate Means to Collect Extensions of Credit
Count Twelve; Extortion Conspiracy (Cosmo's Bar)

---

[1]　　Mr. Rudaj was convicted of Racketeering Act One (Operation of Illegal Gambling Business); Racketeering Act Three (Extortion Conspiracy; Sal Misale); Racketeering Act Four (Extortion Conspiracy; Foti Dimopoulos/Antonios Balampanis); Racketeering Act Five (Extortion Conspiracy; Soccer Fever); Racketeering Act Nine (Extortion Conspiracy; Mirage); Racketeering Act Ten (Conspiracy to Use Extortionate Means to Collect Extensions of Credit/Extortionate Debt Collection); Racketeering Act Twelve (Extortion Conspiracy; Cosmos Bar); Racketeering Act Thirteen (Extortionate Extension of Credit); Racketeering Act Fourteen (Extortionate Extension of Credit).   Mr. Rudaj was acquitted of Racketeering Act Two, the Attempted Murder and Conspiracy to Murder Gaetano Peduto in 1993 and Count Four which charged the Assault in Aid of Racketeering of Michail Hirakis.

*Law Office of James Kousouros*                                    *Page 1 of 25*

Count Thirteen; Use and Carrying of a Firearm
Count Fourteen; Bank Fraud
Count Fifteen; Bank Fraud

The undersigned has reviewed the pre-sentence report and to follow are defense objections to certain delineated factual assertions made therein.  Said objections were sent to United States Probation Officer Dawn Doino subsequent to our initial review of the report and this submission is  annexed hereto and labeled **Exhibit** A.[2]  To date we have not received a response from the Department of Probation.  Thereafter the defense objections to the guidelines calculations will be set forth.  For the most part, these are factual issues presented for the court's resolution.  Issues concerning monetary loss, injury, and grouping are briefed after the objections are detailed.  Lastly, this memorandum will address the factors set forth in **18 U.S.C. Section 3553** as they relate to the appropriate sentence to be imposed.

## <u>Factual Objections</u>

→<u>Page 5, ¶¶ 5-6</u>;  These paragraphs reflect the charges contained in Racketeering Act Two, which charged the Conspiracy to Murder and the Attempted Murder of Gaetano Peduto.  This is under Part A which details the "Offense" and "Charge(s) and Conviction(s) (**See, page 4, Part A**).  While ¶46 on page 15 indicates the charges of conviction and does not include Racketeering Act Two therein, this reference reads as a charge for which Mr. Rudaj was convicted.   As the court is aware, the jury acquitted Mr. Rudaj of this charge.  We ask that this reference be deleted in its entirety or in the alternative that the fact of the acquittals be inserted at the end of ¶¶ 5 and 6 on page 5.   It has been the experience of the undersigned that these pre-sentence reports follow a defendant and are relied upon to a great extent for the determination of intra-facility decisions.  Prison officials will refer to this reference as though it were a count of conviction unless specifically indicated otherwise.

→<u>Page 11, ¶ 29</u>; this paragraph should reflect the fact that Mr. Rudaj was acquitted of this count.

→<u>Page 15, ¶ 46</u>; the sentencing date should be corrected to reflect June 16, 2006.

→<u>Page 18, ¶ 62</u>; this paragraph relates that the information concerning the Rudaj organization was provided, in part, by the government.  In our original letter of objections to the Department of Probation, we requested disclosure to counsel of any information not contained in the record which was provided to the Department of Probation by the government and relied upon in the preparation of this report (**See, Exhibit A, Letter of Objections dated May 15, 2006, page 2**).  To date we have not received a response.  It is the defense position that we are entitled to any and all information provided to the Department of Probation by the government which is relied upon to prepare the Probation Report and to calculate the recommended sentence to be imposed.  Only with full disclosure can the defendant's rights at sentence and appeal be adequately and

---

[2]        While the objections made herein are for the most part the same as those made in the letter to Ms. Doino, we ask that said exhibit be incorporated herewith.

effectively protected. Again we ask that disclosure of this information be provided forthwith or that the sentence be adjourned pending the provision of these materials in order to afford counsel an opportunity to file any additional memoranda which is appropriate upon review of the materials.

→Page 18, ¶63; the defense objects to the statement that "[m]embers of the Rudaj organization promoted the organization's interests through other illegal activities, including…burglary, car theft, and arson". There was no credible evidence adduced at trial concerning the commission of any burglary, car theft or arson. With respect to the car theft allegation, while Gaetano Peduto and Sal Onofrietti testified that they were chronic and undeterrable car thieves in the 1980's and 1990's and that they sold some of the stolen cars to the defendant, the jury clearly rejected this testimony having found Mr. Rudaj not guilty of the only crime for which Peduto and Onofrietti were presented by the government. Indeed while Peduto and Onofrietti were clearly a daily focus of both state and federal law enforcement during this time (the early to mid 1990's), there was absolutely no evidence to corroborate the testimony that Mr. Rudaj participated in the stolen car business at any time. Additionally, the evidence made clear that even accepting the jury's verdict, as we must, there was no evidence that the Rudaj organization was even in existence at this time. With respect to any burglary or arsons committed to promote the organization's interests, there was no evidence to support this statement.[3] As the court may recall, the government proffered evidence of these crimes in it's §404(b) submission but this evidence was precluded at trial. As such, there is no basis upon which to accept and leave this statement in the pre-sentence report as it was not presented and proven at trial.[4] Mr. Rudaj cannot, it is respectfully submitted, be now subjected to an enhanced penalty based upon a mere allegation, unpresented and thus not proven to a jury beyond a reasonable doubt. Based upon the foregoing we respectfully request that the references to these uncharged and unproven crimes be deleted.

→Page 19, ¶ 67; the defense objects to the phrase "3) would not use violence without backup from the other members of the organization". This comment as well is unsupported by the evidence and should be excised from the report.

→Page 19, ¶ 68; the reference to sleepers and the remaining sentence which follows should be placed in the proper context. While cooperating witness Mauricio Sanginiti testified that the organization employed "sleepers", Mr. Rudaj never made this claim. The appropriate source of this reference should be identified if this alleged fact is to remain in the report and be relied upon by the court.

---

[3]      There was, as the court may recall, a veritable wealth of burglaries, robberies and one arson (though three were planned) committed by Peduto and company. These crimes, however, did not involve this defendant or any of the co-defendants.

[4]      It is perhaps with respect to allegations such as these that the government has provided  information beyond that disclosed in the 404(b) submission which is mentioned on Page 18, ¶62.   If this is the case, it is a perfect example of why the defense is entitled to disclosure of all information upon which the Department of Probation has relied in making the conclusions found in this report. While these crimes are not presented as counts of conviction and thus factored into the guidelines analysis, they are certainly included in the report to influence this court's analysis of the offenses and Mr. Rudaj in terms of the appropriate sentence to be imposed.

→<u>Page 19-20, ¶ 69</u>; the defense objects to the sentence; "[a]lso in the past, Rudaj and Colotti worked with Vinnie Basciano, a capo in the Bonanno LCN family". This is unsupported, if not flatly contradicted by the trial evidence and discovery provided by the government. Basciano was mentioned as an individual under whom Peduto and Onofrietti worked at one time stealing cars and attempting to kill anyone for whom an alleged request was made of them. As for Messrs. Rudaj and Colotti, the testimony in this regard in no way supported the existence of a working relationship between Basciano and these defendants and indeed, to the contrary, according to Peduto, it was Basciano who gave him permission to kill Mr. Colotti. As for Mr. Rudaj, Basciano allegedly did not even consider him worthy of, or important enough, to warrant being killed. We submit that this statement is factually incorrect and should be excised from the report.

→<u>Page 20, ¶ 71</u>; Spelling correction, Sal Misale.

→<u>Page 20, ¶ 72</u>; the defense objects to the statement that "RUDAJ advised COLOTTI and DEDAJ to physically assault Misale. This statement is entirely unsupported by the evidence and could not have been extrapolated from the testimony which unequivocally demonstrated that Mr. Rudaj was not in the country when the alleged assault occurred. This fact was not and is not disputed by the government.[5] Sal Misale testified that he called Mr. Colotti at 5:00 AM and threatened his family in Italy; that he knew where they lived and he implied that harm would befall them. This was in a message left as the call was not answered. There was never a dispute that it was this telephone call that precipitated the meeting during which Misale alleged that he was assaulted. There was never any dispute that Mr. Rudaj was not involved in these events and was told about them later. Indeed there was clearly a question as to whether the assault, assuming as we must that it occurred, was related to the bar as opposed to the personal threat admitted to by Misale against Colotti's family. While the defense must accept for purposes of sentencing the jury's verdict convicting Mr. Rudaj of Assault in Aid of Racketeering, there is absolutely no support in the record, trial and otherwise, for the statement that Rudaj in any way <u>*instructed*</u> anyone to assault Misale or for that matter that he knew of the alleged event prior to it's alleged occurrence. As such, this reference should be stricken from the report.

→<u>Page 20, ¶ 72</u>; the defense objects to the statement that the demanded partnership in the Puerta Roja Bar would have been worth more than $10,000.00 to the defendants. We submit that this statement of valuation is erroneous and in any event far too speculative to be relied upon in the sentencing of Mr. Rudaj. There can be no question but that Misale was losing money at this bar and that any partnership would require a significant improvement in the business of selling dances with women for this "partnership" to have been worth anything at all. We therefore object to the speculative and unsupported valuation provided.[6]

---

[5] The government's letter of May 22, 2006 to Probation Officer Dawn Doino confirms this as the government specifically states that "[d]efendant Rudaj was out of the country when Colotti beat Misale, but made the first demands for Misale's bar…" (**See, Government's letter, dated May 22, 2006, Exhibit B**).

[6] This objection will also be addressed in the portion hereof in which the guidelines calculations are discussed. This amount is factored in to the guidelines on page 28, ¶ 122.

→Page 20-21, ¶ 73;

(a) herein it is stated that Mr. Rudaj and his co-defendants conspired to wrongfully take the property of victims 3 and 4 who were believed to be members of a competing criminal organization involved in the illegal gambling business.  This paragraph refers to Antonios Balampanis and Foti Dimopoulos, the beating of Balampanis to "send a message" to Dimopoulos and the subsequent assumption of their management of the gambling activities in Astoria.  It is thus posited that Balampanis and Dimopoulos were the extortion victims. These statements are not supported by the record.  First, Balampanis repeatedly and categorically denied that he was in any way involved in any illegal activity with Dimopoulos.  Indeed, he denied even knowing *whether* Dimopoulos was involved in any criminal activity.  While he "sensed" that something was wrong with his friend, while Balampanis was repeatedly pressed on cross examination as to why Dimopoulos was upset, he repeatedly stated that he did not ask Dimopoulos what was bothering him nor did he ask for a definition of the "message" that his alleged beating signified.  As such, Balampanis, by his own testimony could not have been a viable extortion victim.

(b) Dimopoulos, according to the government's evidence, did not own any of the gambling businesses allegedly extorted.  He was an employee of the Luchese family.  He thus had nothing to turn over and he too was not a viable victim of any extortion.  If there was any victim in this case, it could have only been the Luchese Crime Family and the government's evidence in this regard cannot support any extortion as the government's evidence presented an *agreement* between the defendants and the Lucheses.  Furthermore, the Luchese Family, the "competing criminal organization" could not possess any legal property right to commit crimes in Astoria and, as such, could not have been the victim of any extortion.

(c) The defense objects to the characterization of Balampanis' injury as "serious bodily injury" as same does not fall within the ambit of such injury as defined in the guidelines (**U.S.S.G.§1B1.1, *Application Notes 1(B), 1(L)*)**.

(d) The defense further objects to the statement that this beating/extortion resulted in the earning of millions of dollars.[7]  There was no evidence to support that this extortion in any way resulted in or facilitated the takeover of the gambling business in Astoria.  The government's evidence was that Dimopoulos collected money from the gambling clubs and gambling machines for the Luchese Family.  He did not own the business; he was an employee.  The evidence credited by the jury was that the defendants presented the Luchese family with a business proposition, to wit; that they would assume control of the gambling business in Astoria and pay a percentage of the profits to the Luchese family.  In tape recorded conversations, this supposed proposition is discussed by both Mr. Rudaj and Mr. Nuculovic.  The only proposition posited to Foti Dimopoulos was by Nuculovic and this was for Dimopoulos to work for these defendants in the same position he occupied at the time. Dimopoulos' acceptance or declination of this offer in no way affected whether or the extent to which these defendants became involved

---

[7]         See, page 29, ¶ 130.

in the Astoria business.  This incident did not result in *any* profits to the defendants and any such assertion should be deleted from the factual recitation contained in the paragraph cited herein.

(e) In addition to the above, the valuation assessed to the assumption of gambling operations by these defendants is wholly speculative and not supported by the evidence.  At the outset, there was never any evidence of past earnings by the Luchese family and thus there was no credible comparison.  Assuming the viability of the extortion to begin with, the manner of valuation used is without legal foundation.   There was no credible evidence to support the valuation assessed in the report.

→Page 21, ¶ 74;  the defense objects to the statement that Soccer Fever had been earning at least $6000 per week and if closed, would cause the gamblers to play at the defendant's dice club. Likewise the defense objects to, as wholly speculative and unsupported by the evidence, the assertion that the defendants earned approximately $800,000.00 from the commission of this act.

The evidence adduced at trial was that Soccer Fever was open for two nights prior to the incident.  While Michael Hirakis testified that the club earned money on these two nights, it is wholly speculative to assert that on the basis of two nights, a $6000 weekly *profit* is a reliable assertion, especially in the calculation of the amount of time a man's liberty will be taken from him.  It should also be noted that Hirakis was *only* witness related to the events in Astoria whose testimony was almost entirely discredited by the jury.[8]   In any event, it is simply inaccurate to state that the club was earning any amount of money per week.  It is clear that at best, this figure is arrived at by *estimating* what the club *may* have earned, *assuming* a host of factors remained constant.[9]  The fact is that there is a palpable dearth of any credible evidence upon which to extrapolate such a figure and this conclusion is far too speculative given the amount of time the club was open.[10]   Likewise, it is entirely speculative to assert that once the club was closed, the defendants earned approximately $800,000 because the displaced players would then play at the defendant's dice game.   There was simply no support for a causal relationship between the closing of Soccer Fever and the profits at Skutaria,  and the testimony clearly indicated that there were other dice games to attend.[11]   As such, the statement that the defendant's profited in the amount of $800,000.00 should be stricken from the report.

---

[8]     The jury obviously discredited the testimony of Gaetano Peduto and Sal Onofrietti concerning the attempted murder, however, this was an act wholly unrelated to the enterprise charged, occurred in 1993 and had nothing to do with Astoria.

[9]     It appears, for example, that the writer has simply taken the $6000 figure (based upon one night of operations), multiplied it by a number of weeks, and then attributed this entire amount to the defendants' profits. This is clearly improper and requires the court to engage in a number of overly speculative leaps.  First the weekly profit must be assumed, an assumption which defies logic, and then the attribution of the entire amount is made without any evidence to support such an attribution.

[10]     See, Page 30, ¶ 138.

[11] The court may recall that once Mr. Rudaj and Mr. Nuculovic had a falling out and exchanged words publicly, the business at Skutaria was adversely affected.  After all the testimony concerning gambling in Astoria it cannot be credibly asserted that these players just stayed home.  There were clearly other games run by Napoli in Brooklyn and others in Bayside and for that matter, in Astoria.

→Page 21-22, ¶ 77;   the defense objects to the statement that RUDAJ, COLOTTI and DIPIETRO sent conspirators to the Mirage strip club to "cause trouble" and thus, would obtain "protection money" from the club's owners.   Additionally, the defense objects to the statement that the defendants would have received protection payments in excess of $50,000.00 from the owners of the Mirage.   These statements are not supported by the evidence or the government's theory of prosecution.   The evidence presented was that the defendants met with the owner of the Mirage and sought a partnership.   There was never any evidence that anything these defendants did or said was with the goal of receiving protection payments.   In the tape recorded conversation, the only time the actual owner's voice was ever heard at the trial,[12] Pete Fischetti discussed with Rudaj and Colotti, the prospect of a partnership.   Fischetti was repeatedly told that the defendants wanted no money from him and that even though they would be partners, the defendants would receive nothing until Fischetti first paid off the mountainous debt he had amassed related to the unsuccessful operation of the club.   Again, the defendants never asked for, expressly or impliedly, money for protection and there was no evidence to support this assertion.   Interestingly, the report says nothing of the proposed partnership, which was the gravamen of the charge presented to the jury.   The entire recitation of events contained in this paragraph is inaccurate, not based upon any trial evidence, and should be deleted and replaced with the facts alleged during the trial.

→Page 22, ¶ 80; the defense objects to the statement that the defendants attempted to obtain money and property from the owner of Cosmos and that they "threatened to place a gambling machine" in the bar thus earning them more than $10,000.   The evidence was too clear on these points.   The defendants took nothing in terms of money or property from the owner of Cosmos.   The owner of Cosmos had been forced by Billy Schwartz to permit Schwartz to place a gambling machine in his bar.   These defendants, accepting the verdict, displaced Schwartz.   They took nothing from the owner of Cosmos, who made clear that as long as he received his money he did not care whose machine generated this money.     As for the $10,000 amount, again, this is speculative and it cannot be said that the "victim" of the extortion actually lost anything, which as will be discussed, ***infra***, is the proper measure of loss to be assessed.   The owner of Cosmos lost nothing as he continued to receive the same amount of money, if not more, after the defendant's placed their machine in the club.

→Page 23, ¶ 83; the defense objects to the statement "[a]t times, each of these gambling clubs would earn more than $10,000 per evening".   This statement seems somewhat misplaced and suggests that the organization controlled *all* of the gambling clubs mentioned in this case.   As the court is aware, the organization was alleged to have one club in Astoria, Skutaria, and another club in Port Chester, New York, and two clubs in the Bronx.   The other clubs were controlled by their separate owners, many of whom were charged in this case, and the defendants' connection with these clubs was that they had gambling machines therein.   The earnings therefore of the clubs not controlled or owned by this organization are not relevant as

---

[12]      The government presented all it's evidence on this count through the testimony of agents and bouncers. The actual victim, though a government cooperator, in contact with the agent the night before the agent's testimony, was never called to testify.

they relate to these defendants and have no bearing on any monetary assessments to be made in this case.

→Page 24, ¶ 92; the defense objects to the assertion that the owner of Calda's bar was told that he must "accept the Rudaj Organization's gambling machines".  As the court is aware, Mr. Rudaj was not charged in this count and the tape recorded conversations belie any assertion that it was Rudaj's machines that were to be placed in the bar.

→Page 26, ¶ 102; as the defendants were arrested in 2004, the 2003 Guidelines Manual should be utilized in calculating the applicable offense levels.

→Pages 26-27, ¶¶ 104-109; the defense objects to the separate grouping of the extortion and related gambling offenses.

→Page 28, ¶ 119;   We submit that Mr. Rudaj should be granted a two level downward adjustment for acceptance of responsibility as this defendant and the others always conceded the gambling charges in this case and, as such, the adjusted offense level for the gambling offense group should be 14.

→Page 28, ¶ 121;  the defense objects to the two level enhancement for "an implied or express threat of bodily injury" to Misale as the evidence made clear that Mr. Rudaj was not a party to the violence testified to in any form.

→Page 28, ¶122; we object to the one level enhancement as the evidence did not establish, by any standard a value to any demanded partnership.  The Puerta Roja bar was losing money and there is no way to assess a positive value to a partnership in a losing business with no assets.

→Page 29, ¶ 125; Mr. Rudaj objects to the four level role enhancement for this act.  There can be no dispute that Mr. Rudaj was out of the country during the commission of the offense and that he did not participate or direct that any of the conduct alleged be committed.  At best, the government alleged that Mr. Rudaj may have been aware of the events testified to.

→Page 29, ¶ 127; Based upon the foregoing objections, we submit that the adjusted offense level for Group 2 should be 20.

→Page 29, ¶ 129; we object to the two level enhancement for "an implied and express threat of bodily injury to" Balampanis and Dimopoulos.  Neither individual was threatened.  Balampanis was beaten without warning and the evidence was vague as to why he was beaten.  One posited theory was because he broke machines that belonged to the defendants while Balampanis claimed that he was told by Dimopoulos that it was to send a message to Dimopoulos.  Balampanis, however, denied ever engaging in criminal activity with Dimopoulos and testified that he never even asked Dimopoulos what the message was. Dimopoulos, on the other hand, was, according to the defendants, offered a job.

We further submit that this two level enhancement is subsumed by the seven year consecutive sentence to be imposed on the conviction pursuant to §924(c) and join the arguments of co-counsel in this regard.

→Page 29, ¶ 130; we object to the adjustment for the government estimated $1.5 million in profits from Astoria gambling operations which were allegedly taken over by the defendants. At the outset, we reiterate the argument made herein that control of illegal activities does not constitute property for which one can have a "legal right". Additionally, neither Balampanis nor Dimopoulos controlled or possessed the property, [illegal gambling] which is the subject of this enhancement. Balampanis repeatedly denied ever conducting any illegal activities with, for, or on behalf of Dimopoulos or anyone else. Dimopoulos collected for the Luchese family. He owned and controlled nothing. Finally, the speculative amount of the defendant's gain from an extortion is not the appropriate measure for this adjustment. The loss to the Lucheses was never established and the defendant's gain, even if an appropriate measure, is far too speculative to be relied upon to generate the enhancement assigned by the Department of Probation.

→Page 29, ¶ 131; we object to the four level enhancement for serious bodily injury. Balampanis did not suffer the type of injury which causes extreme physical pain and protracted impairment of a bodily function, surgery, hospitalization and physical rehabilitation (**U.S.S.G. §1B1.1(L)**). Balampanis was back in the gambling clubs the next day confronting Mr. Nuculovic concerning his beating. The injury ambiguously testified to, at best, falls within the ambit of "bodily injury" (**U.S.S.G.§ 1B1.1(B)**). As such, a two level enhancement is appropriate.[13]

→Page 29, ¶ 135; based upon the objections detailed above, the adjusted offense level for this Act should be 24.

→Page 29, ¶ 137; We object to the two level enhancement for implied and express threat of bodily injury as this conduct is encompassed in the seven year consecutive sentence for the conviction pursuant to **§924c**.

→Page 30, ¶ 138; we object to the monetary enhancement as set forth herein (See ¶74 objections).

→Page 30, ¶ 142; Based upon the objections set forth herein, the adjusted offense level for this act should be 22.

→Page 30, ¶ 144; The defense objects to the two level enhancement as there was never any implied or express threat of bodily injury to the government's alleged victim, Pete Fischetti. Fischetti spoke with the defendants concerning a partnership pursuant to which Fischetti would first pay off his debt, which was substantial, and only then would the defendants receive a share

---

[13] The degree of bodily injury comes into play only if the court overrules our objection to any enhancements based upon the characterization of Balampanis as a victim to begin with, a fact the defense does not concede.

of the profits.  There were never any threats of any kind made or implied to Fischetti and the meetings always ended amicably.

→Page 30, ¶ 145;  the defense objects to the statement that the defendants "extorted the victims in that they demanded protection payments".  At the outset, there was only one alleged victim in the Mirage extortion.  Second, there was never any demand for protection payments.  Again, the only request was for Fischetti to permit the defendants to become his partners.  There was never a mention of protection payments. Finally, while the report correctly concludes that no payments of any kind were made, the government has singularly "estimated" that the intended payments would have been in excess of $50,000.00.    There is absolutely no evidence in this record to support this estimation or any enhancement based upon monetary considerations.

→Page 30, ¶ 146;  we object to the enhancement for bodily injury as Mr. Rudaj never sent other co-conspirators to the club to inflict bodily injury. Any physical altercation and injury which ensued at the club was a result of the bouncers handling of the situation and, in any event, independent of Mr. Rudaj's attempt to secure a partnership in the club.

→Page 31, ¶ 150;  based upon the foregoing objections, the adjusted offense level for this act should be 22.

→Page 31, ¶ 154;  we submit that while the evidence supported a leadership role, this offense did not involve five or more participants and thus a two level enhancement is appropriate.

→Page 31, ¶ 156; the adjusted offense level for this offense should be 24.

→Page 31, ¶ 158;  the defense objects to the enhancement for an implied or express threat of bodily injury.  The victim/owner Cosmos was not threatened in any way by these defendants. Indeed he testified that they were polite and that he did not care whose machines were placed in his establishment as long as he received his money.  The only individual who did assault Mr. Christoforou was Billy Schwartz, the individual whose machines were removed from the premises.  Finally, as stated, *supra*, as the opportunity to conduct illegal activities is not a property right to which anyone has a legal entitlement, neither Mr. Christoforou nor Mr. Schwartz can be considered victims under the Hobbs Act.

→Page 31, ¶ 159;  the defense objects to the monetary enhancement for the same reasons stated above.  There is no evidence to support this enhancement.

→Page 32, ¶ 163;  based upon the foregoing objections, the adjusted offense level for this act should be 22.

→Page 21, ¶171;  we object to the twelve level enhancement based upon a reasonably foreseeable intended loss for the loans in issue.  As the report correctly notes, the terms of the loans have been fully complied with and there is no evidence to suggest that any loss was ever intended by Mr. Rudaj.  Indeed, while the documentation presented may not have been accurate,

the bank officer who testified made clear that the bank was not harmed, and that at the time the loans were applied for and granted, the bank did not strictly rely upon its own procedures. Mr. Rudaj had other loans with the bank, was viewed as a good risk and the documentation was tailored to, without any intent to defraud, to secure the loans.

→Page 33, ¶ 175; based upon the foregoing objection, the adjusted offense level should be 7.

→Page 33, ¶¶ 176-192; While our objections to the grouping contained in the report will be detailed below, even if the grouping as reflected therein is appropriate, based upon the foregoing objections, the adjusted offense levels we submit are accurate result in an adjusted offense level of 31 as detailed below.

|  |  | UNITS |
|---|---|---|
| Adjusted Offense Level for Group 2 | 24 | 1 |
| Adjusted Offense Level for Group 6 | 24 | 1 |
| Adjusted Offense Level for Group 8 | 24 | 1 |
| Adjusted Offense Level for Group 4 | 22 | 1 |
| Adjusted Offense Level for Group 5 | 22 | 1 |
| Adjusted Offense Level for Group 7 | 22 | 1 |
| Adjusted Offense Level for Group 2 | 20 | 1 |
| Adjusted Offense Level for Group 1 | 14 | 0 |
| Adjusted Offense Level for Group 9 | 7 | 0 |
| **Total Number of Units** |  | **7** |
| **Greater Adjusted Offense Level** | **24** |  |
| **Combined Adjusted Offense Level** |  | **31** |
| **Total Offense Level** |  | **31** |
| **Sentencing Range** | **108-135 months**[14] |  |

---

[14] Based upon these calculations we submit that ¶ 241 on page 40 should reflect that based upon a total offense level of 31 and a Criminal History Category of I, the guideline range of imprisonment is 108-135 months.

**Monetary Loss**

As indicated above, we have lodged our objections to each and every monetary enhancement assessed in the pre-sentence report (**¶122 (Misale; more than $10,000 but less than $50,000.00)**; **¶130 (Balampanis/Dimopoulos; more than $1.5 million)**; **¶138 (Soccer Fever; more than $800,000)**; **¶145 (Mirage; more than $50,000)**; **¶159 (Cosmos; more than $10,000.00)**. We submit that given the unusual (and unprecedented) nature of the extortion convictions, the calculation of monetary loss is nearly impossible, and is certainly not commensurate with that advocated by the government and the pre-sentence report. As detailed above, the calculations are entirely speculative and otherwise unsupported by the evidence. Most significantly they are improperly based, not on any "loss" but on defendant's purported gain.

**U.S.S.G. §2B3.2(b)(2)** provides that [i]f the greater of the amount demanded or the loss to the victim exceeded $10,000, increase by the corresponding number of levels from the table in §2B3.1(b)(7)". According to **2B3.2**, *Application Note 5*, for extortion-related crimes, "loss to the victim . . . means any demand paid plus any additional consequential loss from the offense (e.g., the cost of defensive measures taken in direct response to the offense." This language, of course, tracks the legal notion that the crime of extortion requires not only the ***deprivation*** but also the ***acquisition*** of property. **Scheidler v. NOW**, 537 U.S. 393, 123 S. Ct. 1057; **Porcelli v. United States**, 404 F.3d 157, 161 (2d Cir. 2005). The focus is unequivocally upon the loss to the victim, not the gain to the perpetrator.

The government has sought a five level enhancement for monetary loss emanating from the extortion of Antonios Balampanis. At trial, the government attempted to prove that Foti Dimopoulos was in charge of running the gambling clubs in Astoria for the Italian mafia and that Balampanis was his good friend. According to the sparse proof at trial, the defendants were taking over Astoria gambling and were intent upon chasing Dimopoulos out, thereby causing him to forego his control of the illicit activity. And so, according to the government, the defendants were looking for Dimopoulos, could not find him, and beat up Balampanis instead.

There was absolutely no evidence that Balampanis himself was deprived of ***any*** property or thing of value (save for his physical well-being). The uncontroverted evidence established that he played no part in the ownership of clubs or games, he was not a partner to Dimopoulos, and in short, nothing of value was demanded or taken (acquired) from him**.** He neither refrained from doing any activity which had provided a benefit to him, nor tendered any property, physical or intangible, to the defendants.

The proof of loss with regard to Dimopoulos is no more certain. According to the best government view, Dimopoulos was "running" some gambling clubs in Astoria and making collections for the Luchese crime family of gambling machine proceeds. There was no specificity as to which clubs he was "running," or how his "control" of those clubs legally

translates to "property" or a thing of value.  Indeed, there was simply no evidence that he was making money from this business, or that if he was, the amount thereof.  Of one thing we can be sure; Dimopoulos was an employee, he was not the owner of these clubs or the machines.[15]

The government maintains that the defendants would have been paid in excess of $50,000 from protection payments from the owner of the Mirage.  We have already pointed out that there was no evidence that these defendants ever demanded or received protection payments from this club.  They sought a partnership, not payments of any kind.

The enhancement sought for Soccer Fever is improperly based upon the speculative gain to these defendants and simply cannot be extrapolated from ten hours of operation.  As for the enhancement for Misale and Puerta Roja, there is no basis upon which to conclude that Misale lost anything of value and any partnership was worthless at the time of the alleged extortion.

It is simply impossible to be the victim of extortion without the consequent responsive act of consensually tendering "something of value" to the defendants.  **See United States v. Nardello**,  393 U.S. 286, 290, 89 S. Ct. 534 (1969). Concomitantly, in the absence of any proof of the exchange of assets or property, it is impossible to ascertain any quantum of monetary loss.[16]

**Grouping**

The "grouping" of multiple offenses for purposes of sentencing is governed by the dictates of USSG **§ 3D1.2,** which provides, in relevant part:

> All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:
>
> **(a)** When counts involve the same victim and the same act or transaction.

---

[15]       It should be noted that even if Dimopoulos ran clubs, these defendants did not, other than for Skutaria. These defendants took over gambling machine spots.  The clubs belonged to the owners and these owners' relationships with these defendants was that they provided a space for the gambling machines and were paid for this.  Not only did these club owners lose nothing, they gained an income or at a minimum maintained the same income.

[16]        We acknowledge that "[f]or purposes of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information." Guidelines § 2F1.1 Application Note 9; see, e.g., **United States v. Reifler**, 446 F.3d 65, (2d Cir. 2006);  United States v. Carboni, 204 F.3d 39, 46 (2d Cir.2000). Nevertheless, the flexibility inherent in that language is by no means an invitation to invoke some variant definition of loss, predicated upon an assessment of the benefit gained by the defendants.

(b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

(c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

(d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

Specifically excluded from the operation of this subsection are . . .

§§ 2B2.1, 2B2.3, 2B3.1, 2B3.2, 2B3.3

Exclusion of an offense from grouping under this subsection does not necessarily preclude grouping under another subsection.

We recognize that  that with respect to the separately charged extortions, despite the proximity of the conduct in time, space and manner, the express exclusion of extortion (by reference to 2B3.2) from the umbrella of 3d1.2(d) allows for the segregation of this related conduct.

The guidelines do provide, however, for the grouping of these counts under 3D1.2(c) and we submit that the court should find that grouping of these counts is appropriate. Counts are grouped under §3D1.2(c) when "one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts." Section 3D1.2(c) is intended to prevent "double counting" of offense behavior (**See Application Note 5** to §3D1.2(c). Thus, "[a] principle purpose of §3D1.2(c) is to combine like offenses so as to prevent multiple punishment or double counting for substantially identical offense conduct." United States v. Gelzer, 50 F.3d 1133, 1143 (2d Cir. 1995). Further, §3D1.2(c) applies "only if the offenses are closely related." (**Application Note 5**, §3D1.2(c)).
In **Gelzer**, the court held that several firearm possession counts should have been grouped with a postal robbery count. The court observed that the conduct embodied in possessing a firearm was substantially identical to the specific offense characteristic of possessing that firearm during a robbery – as provided for in the robbery guideline, USSG §2B3.1(b)(2)(C). Additionally, the court concluded that the offense conduct underlying the firearm counts was closely related to the specific robbery guideline characteristic of possessing a firearm.

Here, the government alleged that Rudaj used and/or displayed a firearm, pursuant to **§924(c)**, over the 11 year life of the enterprise and racketeering conspiracy. Moreover, the government's posture was that the firearm offenses were a specific mechanism by which the

defendants were able to successfully carry out the extortion-related crimes.[17]  It is clear that the device by which the defendants were allegedly able to actualize the requisite "force, violence, or fear," according to the government, was the persistent possession of the firearms as charged in the **§924(c)** count.

The reciprocal link between the firearms offense embodied in **924(c)** and the extortion crimes tracks the logic underlying the Second Circuit's decision in **United States v. Zhou**, 428 F.3d 361 (2d Cir. 2005). In **Zhou**, the defendants were charged with an extortion conspiracy in which they brandished firearms during the course of a series of encounters with the putative victims. As a consequence, they were charged and convicted of both extortion conspiracy and **924(c)** counts. In a decision which exemplifies the interrelatedness of the crimes charged herein, the court first held that the actual criminal conduct did not satisfy the elements of extortion and warranted reversal. In addition, since the "extortion" was an integral predicate of the **924(c)** charge, the court reversed those convictions as well. The link between the extortion offenses and the **924(c)** conduct in this case is no less palpable, and therefore warrants grouping under **§3D1.2(c)**.

We further submit that the gambling charges should also be grouped with the extortion counts.  With the exception of the Mirage and Puerta Roja extortions (groups 2 and 5), the other charged extortions were all with the common goal of facilitating the gambling count.  Mr. Rudaj, while assessed a managerial role for all counts, has been assessed a role enhancement for the gambling which was made possible by the extortions.  He has also been assessed a role enhancement for the extortions.  Alternatively, we submit that grouping of the extortions (except for groups 2 and 5) and the gambling offenses into one group is appropriate pursuant to **§3D1.2(b)** which provides for grouping "[w]hen counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan".   There can be no question but that the gambling and delineated extortions were connected by a common criminal objective and were part of a common scheme or plan.  The government's case was simple.  The defendants took over the gambling machine business and dice game in Astoria and committed extortions in order to expand it and protect it.  The victims we submit, however, were the public, and the societal interests affected were identical in all of these crimes.   The government will assert that they have identified their victims and that this precludes the grouping of these counts, however as demonstrated above, the government's purported victims were not and cannot be considered viable extortion victims in this case.  Hirakis, Balampanis, Dimopoulos and Christoforou either had nothing to surrender or simply did not surrender anything to which these purported victims had a legitimate property or

---

[17]       This offense,  within the context of federal crimes, in relevant part, "means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear." 18 U.S.C. § 1951(b)(2) (emphasis added). As the courts have noted, extortion is frequently exemplified by "revenue-producing measures ... utilized by organized crime to generate income"- measures "such as shakedown rackets and loan-sharking." **United States v. Nardello**, 393 U.S. 286, 295, 89 S. Ct. 534 (1969).

proprietary interest in.  As such, we submit that under the unique facts of this case, the victims in these charges were the same and the conduct in each was clearly within the ambit of **§3d1.2(b)**.[18]

Moreover, the fractured grouping of identical offenses into discrete sentencing platforms overstates the seriousness of the charged conduct. As the court itself bore witness, many of these "extortions" involved no identifiable surrender of benefit, either pecuniary or intangible. While the convicted conduct is undoubtedly serious, the rigid grouping mechanism mandates a sentence in drastic disproportion to the reality of the acts themselves. As such, we urge the court to consider this overblown aspect of the guidelines calculation in assessing a non-guidelines sentence under **18 U.S.C.§ 3553**.[19]

Based upon the foregoing, we respectfully submit that groups 1 (gambling), 3 (Balampanis/Dimopoulos), 4 (Soccer Fever), and 7 (Cosmos) should be grouped.  This would result in  total of six groups instead of nine. The following offense level computations should be applied herein.

|  |  | **UNITS** |
|---|---|---|
| Adjusted Offense Level for Group 1 (gambling, Balampanis/Dimopoulos, Soccer Fever, Cosmos) | 24 | 1 |
| Adjusted Offense Level for Group 2 (Misale) | 20 | 1 |
| Adjusted Offense Level for Group 5 (Mirage) | 22 | 1 |
| Adjusted Offense Level for Group 6 | 24 | 1 |
| Adjusted Offense Level for Group 8 | 24 | 1 |
| Adjusted Offense Level for Group 9 | 7 | 0 |
| **Total Number of Units** |  | **5** |
| **Greater Adjusted Offense Level** | **24** |  |
| **Combined Adjusted Offense Level** |  | **29** |

---

[18]     We respectfully submit that the Court  cannot simply rely upon and adopt the presumed findings embodied in the jury verdict on issues related to sentencing and that the court must make it's own factual findings on these issues (**United States v Carr**, 5 F.3d 986, 995 (6th Cir 1993); **United States v Jacobo**, 934 F.2d 411 (2d Cir. 1991).

[19]     The issues of a non-guidelines sentence in the wake of **United States v Booker**, 125 S.Ct.738 (2005) will be detailed more fully, *infra*, as they relate to the delineated factors in the statute, however, we submit that the court should also consider this grouping decision as well in this vein.

**Sentencing Range**                                    **87-108 months.**[20]

### Acquitted Conduct/ Burden of Proof for Enhancements

As we have noted above, the report is replete with factual references to conduct for which Mr. Rudaj was ultimately acquitted. We submit that the court should not consider any acquitted conduct in its calculation of Mr. Rudaj's sentence. Moreover, we urge the court to assess the evidence seeking any enhancements or adjustments through the lens of heightened evidentiary scrutiny and to hold the government to the heightened standard of beyond a reasonable doubt in determining the propriety of the requested enhancements.

In **United States . Watts**, 519 U.S. 148, 117 S. Ct. 633 (1997),the Supreme Court condoned the utility of relevant conduct by a sentencing judge for which a trial jury had acquitted the defendant. It is undeniable that the fact-limited holding of **Watts** was before the monumental transformation of Sixth Amendment jurisprudence embodied in **Apprendi v. New Jersey**, 530 U.S. 466, 120 S. Ct. 2348 (2000), **Blakley v. Washington**, 124 S. Ct. 2531, 2538 (2004), and **United States v. Booker**, 125 S. Ct. 738 (2005). This recent spate of cases has reduced the continued vitality of **Watts** to a questionable proposition.[21]

The rationale of Judge Gertner in **United States v. Pimental**, 367 F. Supp. 2d 143 (D. Mass 2005), seems both logical and compelling. In refusing to consider acquitted conduct as relevant for purposes of sentencing, the court observed:

> **United States v. Booker** substantially undermines the continued vitality of **United States v. Watts** [citation omitted] both by its logic and by its words. It makes absolutely no sense to conclude that the Sixth Amendment is violated whenever facts essential to sentencing have been determined by a judge rather than a jury, **Blakeley v. Washington**, 542 U.S. ----, 124 S. Ct. 2531, 2538, (2004), and *also* conclude that the fruits of the jury's efforts can be ignored with impunity by the judge in sentencing.

---

[20] The calculations with the offense levels in the pre-sentence report would be 35 and sentencing range of 168-210 months as the highest offense level would be 33 and 1.5 units added for groups 2, 5 and 6.

[21] Justice Stevens intimated as much in the principal opinion in **Booker**. While he concluded that **Watts** "is not inconsistent with today's decision," he noted that the case did not involve "any contention that the sentencing enhancement had exceeded the sentence authorized by the jury verdict in violation of the Sixth Amendment." **Booker**, 125 S. Ct. at 754. He reduced the decision in **Watts** to one reflecting "a very narrow question regarding the interaction of the Guidelines with the Double Jeopardy Clause," noting that it "did not even have the benefit of full briefing or oral argument." 125 S. Ct. at 754 n. 4. Therefore, he surmised, it was "unsurprising that [the Court] failed to consider fully the issues presented to us in *these* cases." **Id.** (emphasis added).

In **United States v. Vaughn**, 430 F.3d 518 (2005), the Second Circuit determined that the consideration of acquitted conduct for purposes of sentencing was not inconsistent with principles articulated in **Booker**. While we recognize the precedential value of this decision, we submit its holding is violative of the constitutional precepts mandated by **Booker.**

**Id.** at 150.

Judge Gertner reasoned that the advent of the guidelines had blurred the lines between the previously discrete roles of jury and judge. Before the guidelines, jury decision-making was governed by the rules of evidence and the highest burden of proof that could be imposed – proof beyond a reasonable doubt. Sentencing decisions were constrained neither by concrete rules nor fixed burdens of proof. Judges could consider virtually all facts and circumstances about the offense and the offender. However, with the promulgation of the sentencing guidelines, according to Judge Gertner, "[w]hat the *judge* did mirrored precisely what the *jury* did – finding facts with determinate consequences, only in a setting with few procedural safeguards, and even less legitimacy." (Id. at 152; **See also, <u>United States v. Jaber</u>**, 362 F. Supp. .2d at 368, 2005 WL 605787, at *2 (D. Mass.2005).

This hybrid role of the sentencing court survived and was even exaggerated by the decision in **<u>Booker</u>**. The need for judicial fact-finding and its concretized consequences was not obviated by the now-advisory status of the guidelines.  Indeed, the necessity of deference to specific fact-finding by the jury is even greater now:

> However, when a court considers acquitted conduct ***it is expressly considering facts that the jury verdict not only failed to authorize; it considers facts of which the jury expressly disapproved***. Nor is it enough to hark back to the idea that the jury "only" decides guilt beyond a reasonable doubt while the judge decides facts by a fair preponderance of the evidence. The argument is circular: The fair preponderance standard made sense in the context of fully indeterminate sentencing. It does not make sense in this hybrid regime where rules still matter, and certain facts have important, if not dispositive, consequences.

367 F. Supp. 2d at 152-53 (emphasis added).

***See also*** **<u>United States v. Coleman</u>**,  370 F.Supp.  2d 661 (S.D. Ohio 2005).  Based upon the foregoing, we respectfully submit that the Court should not consider acquitted conduct in it's sentencing determination herein.  We further submit that any enhancements under the guidelines should be subjected to a standard of beyond a reasonable doubt.

In **<u>Booker</u>**, supra, the merits majority specified that the question was whether the Federal Sentencing Guidelines violated the Sixth Amendment. The Booker majority repeated, in the context of the right to have the jury find facts, that the facts must be "reflected in the jury verdict or admitted by the defendant." The Court therefore left intact the precedent requiring proof beyond a reasonable doubt of factors increasing the offense level.

Under the remedial portion of **<u>Booker</u>** as well, the reasonable doubt standard should be required for any guidelines enhancements. The Court left in place the legislatively established

process for sentencing: probation officer recommendation, the opportunity to object, and factual resolution by the court of contested facts. The reasonable doubt standard is necessary to protect the liberty interests at risk under these circumstances. It also insulates the right against self-incrimination, which -- with a preponderance standard -- would necessarily be burdened by increased punishment where the defendant remains silent.

Although by no means controlling, the district court's decision in **United States v. Siegelbaum**, CR No. 02-179-PA (D.Or. Jan. 18, 2005) sets forth an analysis of **Booker** that fully supports the view that the reasonable doubt standard is still applicable to the guidelines portion of sentencing.

As Judge Panner noted, "at least five Justices have said that sentence enhancements are of sufficient importance to warrant application of the reasonable doubt standard in some instances." **United States v. Siegelbaum**, CR No. 02-179-PA, Opinion at 5-6 (D. Or. Jan. 18, 2005). Even if the guidelines are viewed as advisory or presumptive, they constitute legislatively defined facts that measurably increase the range of potential punishment. Because Booker only addressed the Sixth Amendment, the Fifth Amendment question of the reasonable-doubt standard, which derives from the Due Process Clause, remains viable under the guidelines. Winship, 397 U.S. at 363-64. As the Court noted, "[t]he reasonable doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions resting on factual error." Id. at 363.

Judge Panner recognized the "second component to Blakely/Booker", that "[f]acts used to enhance a sentence, if not admitted, must be proven beyond a reasonable doubt rather than by a preponderance of the evidence." supra, at 6. By citing to the Supreme Court cases finding Winship to apply retroactively, Judge Panner noted the critical importance of the high standard of proof where liberty is at stake. Id. In this context, the reasonable doubt standard is a necessary safeguard to assure that "longer incarceration" does not result from a prisoner's exercise of self-incrimination rights at sentencing, leading to an unreliable result on a controverted issue by use of a preponderance standard.

Based upon the foregoing, we submit that any guideline enhancements which increase the potential sentence under the guidelines, while albeit advisory, should be assessed only if demonstrated beyond a reasonable doubt.

### The Court should consider a non-guidelines sentence pursuant to 18 U.S.C. §3553

### A. Booker/FanFan and United States v Crosby

As the court is obviously aware, the landscape of federal sentencing was dramatically altered (and perhaps complicated) by the Supreme Court's decision in **United States v. Booker**, 125 S. Ct. 738 (2005). In that complex and multifaceted decision, the Court opined that the federal sentencing guidelines, in their mandatory aspect, were violative of the Sixth Amendment.

The wake of **Booker** has left some interesting disarray amongst the federal circuit courts with regard to its implementation, but the law in the Second Circuit was crystallized in **United States v. Crosby**, 397 F.3d 103 (2d Cir. 2005).   Therein the court detailed with probing clarity the procedure to be followed by sentencing courts in the wake of **Booker** :

> Thus, at this point, we can identify several essential aspects of Booker/Fanfan that concern the selection of sentences. First, the Guidelines are no longer mandatory. Second, the sentencing judge must consider the Guidelines and all of the other factors listed in section 3553(a)[22]. Third, consideration of the Guidelines will normally require determination of the applicable Guidelines range, or at least identification of the arguably applicable ranges, and consideration of applicable policy statements. Fourth, the sentencing judge should decide, after considering the Guidelines and all the other factors set forth in section 3553(a), whether (I) to impose the sentence that would have been imposed under the Guidelines, i.e., a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence. Fifth, the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence.

This was not simply a mechanistic device to comport with some abstract notions of due process. The recognition of the potential inherent tension between the inflexible policies of the guidelines and the post-**Booker** provision for more individualized sentencing is

---

[22]     This statute provides, ***inter alia***,

> The court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed--
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established for–
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ...;
> (5) any pertinent policy statement--
> (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statements by act of Congress ....
> (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

becoming widespread (**United States v. Nellum**, 2005 WL 300073 (N.D.Ind.); **United States v. Ranum**, 353 F. Supp.2d 984 (E.D. Wisconsin 2005).  In a thoughtful and discursive decision,  Judge Pratt observed

> this Court does not mean to be unduly harsh about the wisdom contained in the Guidelines, for wisdom is there. Wisdom, however, also resides in the other statutory sentencing factors, but was not allowed expression under the former mandatory scheme. Each of the factors enumerated under § 3553(a) is, in reality, an expression of our society's multiple interests in sentencing an individual. These factors, too, are constantly in conflict…. The Supreme Court recognized that federal judges have "long looked to real conduct" in order to fashion appropriate sentences.[citation omitted]. This is because district court judges are in the unique position to be intimately acquainted with the facts of each case, while also under oath to uphold the federal constitution and laws. By restoring the discretion that judges have to fashion appropriate sentences, the Supreme Court did not establish a revolutionary new power in the district courts. Instead, the Court returned to the judiciary the ability to shape a sentence that "maintain[s] a strong connection between the sentence imposed and the offender's real conduct ...."

**United States v. Myers**, 353 F. Supp. 2d 1026, 1028-29 (S.D. Iowa, 2005).  We ask this Court to consider the following and to consider a sentence below that provided for by the United States Sentencing Guidelines in rendering a fair and just sentence in this matter.

## B. The proposed grouping analysis overstates the offense level.

Within the context of  the sentencing impact of the grouping of offenses in this case, should the court find that the grouping analysis contained in the pre-sentence report is correct, we submit that the rigidly formulaic framework of the guidelines must yield to a more reasoned assessment.  In this regard, we by no means minimize the conduct of the defendant or the seriousness of the crimes of conviction.  We submit, however, that the grouping provisions of the guidelines in this matter result in an overstated offense level.  Notwithstanding the technical machinations of **§3D1.2** of the guidelines, the heart of this trial was a gambling conspiracy which was fed by extortionate activity which yielded additional gambling activity.  Once the organization took over gambling operations in Astoria, they sought to expand the business by placing machines in other locations.  Hence the charges of extortion at Cosmos and Soccer Fever and as against Balampanis and Dimopoulos.  There can be no question but that these acts were all integrally related to one another and a part of the same course of criminal conduct and yet, the proposed grouping would yield a sentence which far exceeds the combined severity of these crimes.

**C. The mandatory seven year consecutive sentence based upon the §924(c) conviction results in an unduly harsh sentence.**

We also ask the court to note that the **§924(c)** conviction in this case mandates an additional seven years to whatever sentence is imposed on the other charges.  In Mr. Rudaj's case, even if the court imposed the minimum guideline sentence, this would yield a sentence of 24.5 years or 294 months.[23]  In addition to the unwarranted severity of such a sentence, we ask the court to note that this consecutive seven years is a result of conduct which is already subsumed, at least in a practical and intellectually honest sense, in the extortion, loansharking and debt collection convictions.  For every extortion conviction, a two level enhancement is proposed for the implied and express threat of bodily injury pursuant to **U.S.S.G. §2B3.2 (a)**.  For the Misale and Mirage extortions, and the extortionate debt collection, a two level enhancement is proposed based upon bodily injury.  For the Balampanis extortion, a four level enhancement is proposed (**U.S.S.G. § 2B3.2(b)(4)(A)**.  Should the court overrule our objections to these enhancements, we submit that the consecutive seven year sentence would be unduly harsh and tantamount to double counting given that the threat embodied in the brandishing of a firearm has already been factored into the guidelines and has so dramatically affected the advisory sentence provided for by the guidelines.

**D. Consideration of statutory factors pursuant to 18 U.S.C. §3553 warrants a non-guidelines sentence.**

Finally, we ask the court to consider the other statutory factors contained in **18 U.S.C. §3553(a)** and find that a sentence lower than that provided for by the guidelines is appropriate.

### 1.  Nature and Circumstances of the Offense

For approximately nine weeks, this court, counsel, and the defendants listened to the government portray these defendants and Mr. Rudaj as a band of ruthless, merciless individuals bent only on violence and the threat thereof.  We do not submit, for purposes of this proceeding, that there were not violent episodes in the years depicted at this trial, however, we do submit that Mr. Rudaj was not the man the government will seek to convince the Court he is and that in fact, the testimony of fear instilled and injuries sustained was, at least in some important instances, exaggerated.  The government presented evidence which dated back to 1993.  Aside from the attempted murder of Gaetano Peduto, for  which Mr. Rudaj was acquitted, there was no evidence of violent acts committed by him during these earlier years.  Indeed, aside from evidence that he bought cars from Peduto and resold them, Mr. Rudaj was close to a non entity until 2001.[24] I am mindful of the evidence concerning weapons as testified to by Peduto and Onofrietti but their

---

[23]     If the court were to sentence the defendant pursuant to the defense's calculations, this would yield a sentence of 171 months or more than 14 years in the best case scenario or 192 months (16 years) without the adjustments for grouping proposed by the defense.

[24]     Misale said he was just around and said and did little of anything.  Peduto and Onofrietti also had little to say in terms of Mr. Rudaj being any sort of presence in the Bronx at this time.

testimony was clearly and resoundingly rejected by this jury and there is simply no reason for this court to credit it.   We ask Your Honor to remember that Peduto was under constant surveillance during these years as he surrounded himself with alleged members of organized crime.   There was no evidence of violence committed by Mr. Rudaj.   Indeed, after the Peduto/Onofrietti testimony, the trial fast forwarded to 1998 and the Misale incident.   Again, while Mr. Rudaj was convicted on this count, it is undisputed that he was out of the country and had nothing to do with the alleged assault of Misale.   At best, he learned of it later and told Misale he would side with his friends. The tapes played for the jury confirm this.   These tapes, like the others played for the jury, perhaps depicted men somewhat full of themselves, but there was nothing on the Misale tapes to indicate that Mr. Rudaj ever threatened Misale or was in any way involved in the alleged assault of Misale.

Mr. Rudaj and his co-defendants operated some gambling spots in the Bronx and moved into Astoria in 2001.   There were on nobody's radar screen until the Balampanis beating and for all of Balampanis' repeated statements of his injuries sandwiched within his oft repeated "I don't remember",   Antonios Balampanis was back in Astoria the very next day, seeking out and confronting one of the men who so brutally attacked him.   His claims of fear and terror were specious at best.   Likewise, Michael Hirakis claimed he too was savagely beaten and yet, within hours of this devastating incident, he was sitting with one of his alleged attackers and stealing $3500.00 from Nuculovic under the guise of needing it for medical treatment.   This man, after the savage beating, returned to Soccer Fever to collect his $4000.00 and then met Nuculovic and took $3500.00 from him for medical treatment he could have had three times with this money and yet never had.   He then incredibly testified that he still suffers from the effects of a condition he could have rectified the day after his beating.   His doctor confirmed Hirakis' lie when he testified that Hirakis wanted to seek the additional medical treatment but could not afford it.

Again, we do not dispute that there was a violent component to the crimes charged.   We simply ask the court to consider that the sentence called for by the guidelines with the mandatory consecutive seven year sentence is disproportionately harsh given the actual level of violence proven in this case.[25]

## 2.  Personal Characteristics of Alex Rudaj

Mr. Rudaj was born on February 12, 1967 in Montenegro, Yugoslavia.   His father passed away in 1968 and his mother, who had a total of six children and is now 79 years of age, still resides in Montenegro.   Ms. Rudovic is aware of her son's current predicament and while she has been unable to travel to the United States during this time, she remains  in constant contact with her other children in the United States as well as Mr. Rudaj's wife and children.   Mr. Rudaj's bother Peter Rudovic resides in the Bronx with his wife and two children.   His other brother, Prenka resides in Montenegro with his wife and two children.   Mr. Rudaj has a good

---

[25]        By comparison, second degree murder, with a base offense level of 38 provides for an offense level of 235-293 months (**U.S.S.G.§2A1.2**),  voluntary manslaughter 29 with a range of 87-108 months,  aggravated assault with permanent life threatening injury and the discharge of a firearm yields an offense level of 26 with a range of 63-78 months.

relationship with his siblings, they continue to remain supportive and his brother Peter attended the trial very as often as his other responsibilities permitted.

Mr. Rudaj's father passed away when he was an infant and his upbringing was somewhat a lesson in survival.  He attended school and tended to the farm with his mother from a very young age in order to make ends meet.  After high school, he began pre-military training and later declined to continue in the military.  Having become unhappy with life under Communist rule, Mr. Rudaj emigrated to Sweden and after five months, he came to the United States in 1986.  Upon his arrival he lived with family and in the 1990's he applied for and was granted permanent residence status.  In 1988 Mr. Rudaj met his wife, Maria and after a brief courtship, the couple married.  They have three children, Lenora, age 14, Adrijiana, age 12 and Jake, age 8.  Ms. Rudaj is devoted to her husband, has been a constant source of support for him and has been devastated by this trial and conviction.  The three children have also suffered tremendously from the loss of their father.   There is no question but that this entire family has been devastated by the events of the last four years.  Mr. Rudaj is keenly aware that he will spend a considerable period of time away from his children in their most tender and important years and that he will thereafter be deported.  For all the government's expected observations of what they believe is the other side of this man, he does love and miss his family and is crushed by the prospect of spending the next several years away from them.

Mr. Rudaj has been employed his entire life. As stated, *supra*, during his childhood years he lived in Yugoslavia and worked in farming.  Between 1986 and 1989, he was employed as a busboy at Tavern on the Green, in Manhattan.  The work was seasonal and his hours varied and at times, he earned up to $1000.00 per week.  In 1990 Mr. Rudaj worked as a porter for the Douglas Summers Company, a building management company located in Manhattan.  He made $350.00 per week.  He left for employment in White Plains, New York where from 1990 to 1993 he worked as a supervisor of superintendents on Virginia Road and earned $450.00 per week along with free room and board.  From 1993 to 1995, Mr. Rudaj worked as a truck driver and foreman at Two Stars Construction in the Bronx and from 1995 to 2000 Mr. Rudaj worked at Alba Construction Corporation.  He left this employ after suffering a debilitating back injury.  Mr. Rudaj thereafter worked at Portofino's Restaurant located in the Bronx and later worked for his company, Morris Park Games, which this court was made aware of during the trial.

I have been informed that several letters have been submitted to the probation department and some have been directly sent to the court from family and friends of Mr. Rudaj.  These letters clearly reflect that Mr. Rudaj has spent a good part of his life being a friend to many, always willing to assist his family and friends in any way needed.  The court may recall the plethora of letters submitted in our bail application by so many whose lives were positively affected by Mr. Rudaj.  While the court declined to grant bail, the court accepted these materials and verifications. These individuals all knew of the charges against Mr. Rudaj and were nevertheless readily willing to lend their good name to his cause and to post their entire life's savings to secure his release.  They trusted that Mr. Rudaj would never breach their trust as he never had before.

We ask Your Honor to consider that notwithstanding the convictions in this matter, there is another side to Mr. Rudaj that is good and also worthy of consideration.  The potential sentences in this case would effectively take a 39 year old man from his family for decades. The need for deterrence, both specific and general and the need to protect the public do not require such a draconian result given the nature and circumstances of this offense and the history and characteristics of this defendant.  This case is indeed serious and the crimes of conviction call for punishment, however, we respectfully submit that the sentencing range provided for by the advisory guidelines far exceeds that which serves the purposes of **18 U.S.C. 3553**.    This court now has the authority to render a sentence more in conformity with fairness and to meet out justice in a manner more fairly proportionate to the circumstances presented.

It is this return to consideration of individualized characteristics and the other statutory factors, within the advisory framework of the guidelines that we respectfully submit warrant a sentence far less than that called for by the guidelines.

We respectfully join in the arguments of co-counsel where applicable.


Respectfully submitted,


JAMES KOUSOUROS


cc:    Timothy Treanor
       Jennifer Rodgers
       Benjamin Gruenstein
       Assistant United States Attorneys

       Alex Rudaj