UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

ALEX RUDAJ,                          :
NARDINO COLOTTI,
NIKOLA DEDAJ,                        :
PRENKA IVEZAJ,                            S3 04 Cr. 1110 (DLC)
LJUSA NUCULOVIC, and                 :
ANGELO DIPIETRO,
                                     :
          Defendants.
                                     :
----------------------------------X


**GOVERNMENT'S SENTENCING MEMORANDUM**




                              MICHAEL J. GARCIA
                              United States Attorney for the
                              Southern District of New York




TIMOTHY J. TREANOR
JENNIFER G. RODGERS
BENJAMIN GRUENSTEIN
Assistant United States Attorneys

     - Of Counsel -

## TABLE OF CONTENTS

Point I -- ISSUES ADDRESSED BY MULTIPLE DEFENDANTS.............2

  A. Enhancements Under the Extortion Guideline......2

  B. The Defendants Do Not Warrant A Two-Level
    Decrease Based On Acceptance Of Responsibility
    With Respect To The Gambling-Related Charges....9

  C. The PSRs Properly Group the Offenses of
    Conviction...................................15

  D. The Court Should Adopt The Probation
    Department's Calculation Of Enhancements
    Based On The Defendants' Roles As Organizers,
    Leaders, Supervisors and Managers Of Extensive
    Criminal Activity............................19

  E. The PSRs' Loss Enhancements Were Properly
    Calculated...................................21

    1. The PSR Loss Amounts Are Legally Sound.....22

    2. The PSR Loss Amounts Are Supported By
      The Record.................................23

  F. The Court Should Apply Enhancements Based on
    the Bodily Injuries of Balampanis and Hirakis..31

    1. Balampanis's Injuries Were "Serious".......31

    2. Hirakis Suffered Permanent Injuries.......32

  G. Acquitted Conduct/Uncharged Conduct...........42

Point II -- ISSUES RELATED TO INDIVIDUAL DEFENDANTS............54

  A. Colotti Is Appropriately In Criminal History
    Category III.................................54

  B. Ivezaj's Participation in Various
    Offenses.....................................55

i

Point III -- DISCUSSION OF § 3553(A) FACTORS...................56

   A. Defendant Rudaj................................56

   B. Defendant Colotti.............................59

   C. Defendant Dedaj...............................61

   D. Defendant Ivezaj..............................63

   E. Defendants Nuculovic and DiPietro.............66

Conclusion................................................68

**TABLE OF AUTHORITIES**

**Cases**

Andres v. United States, No. 97 Civ. 3246 (AKH),
    2001 WL 290053 (S.D.N.Y. March 26, 2001)..................35

McMillan v. Pennsylvania, 477 U.S. 79 (1986)...................44

United States v. Alba, 933 F.2d 1117 (2d Cir. 1991)...........61

United States v. Baggett, 342 F.3d 536 (6th Cir. 2003)........40

United States v. Booker, 543 U.S. 220 (2005).............16,44,45

United States v. Carboni, 204 F.3d 39 (2d Cir. 2000)..........23

United States v. Castano, 234 F.3d 111 (2d Cir. 2000).........21

United States v. Crosby, 397 F.3d 103 (2d Cir. 2005)..........46

United States v. Damico, 99 F.3d 1431 (7th Cir. 1996).......19,20

United States v. Duncan, 400 F.3d 1297 (11th Cir. 2005).......46

United States v. Enq, 14 F.3d 165 (2d Cir. 1994)..............11

United States v. Ferby, 2005 WL 1544802
    (W.D.N.Y. July 1, 2005)..................................46

United States v. Franklyn, 157 F.3d 90 (2d Cir. 1998).........44

United States v. Garcia, 413 F.3d 201 (2d Cir. 2005).......40,46

United States v. Gelzer, 50 F.3d 1133 (2d Cir. 1995)..........17

United States v. Ginn, 87 F.3d 367 (9th Cir. 1996)...........12

United States v. Hawkins, 87 F.3d 722 (5th Cir. 1996)........40

United States v. Hazut, 140 F.3d 187 (2d Cir. 1998)..........44

United States v. Hughes, 211 F.3d 676 (1st Cir. 2000)........31

United States v. Jacobs, 117 F.3d 82 (2d Cir. 1997)..........23

iii

United States v. Johnson, 964 F.2d 124 (2d Cir. 1992)..........60

United States v. Kleinebreil, 966 F.2d 945 (5th Cir. 1992).....12

United States v. Londono, 76 F.3d 33 (2d Cir. 1996)............60

United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005).....46

United States v. May, 413 F.3d 841 (8th Cir. 2005).............38

United States v. McDowell, 888 F.2d 285 (3d Cir. 1989)........12

United States v. Molina, 106 F.3d 1118 (2d Cir. 1997).........31

United States v. Price, 149 F.3d 352 (5th Cir. 1998)...........36

United States v. Ramos, No. 01-14010, 130 Fed. Appx. 415
        (11th Cir. May 5, 2005)...............................36,38,39

United States v. Shonubi, 998 F.2d 84 (2d Cir. 1993)..........23

United States v. SKW Metals & Alloys, Inc., 195 F.3d 83
        (2d Cir. 1999).........................................44

United States v. Tejeda, 146 F.3d 84 (2d Cir. 1997)...........60

United States v. Vaughn, 430 F.3d 518 (2d Cir. 2005).....44,45,46

United States v. Watts, 519 U.S. 148 (1997)....................44

United States v. Yeager, 210 F.3d 1315 (11th Cir. 2000).......20

**Statutes**

18 U.S.C. § 924(c).......................................passim

18 U.S.C. § 3553(a)......................................passim

United States Sentencing Guidelines § 1B1.1.............32,34,36

United States Sentencing Guidelines § 1B1.3...............43,44

United States Sentencing Guidelines § 2B3.1...................22

United States Sentencing Guidelines § 2B3.2...............passim

United States Sentencing Guidelines § 2K2.4..............3,4,5,6

United States Sentencing Guidelines § 3D1.2...............passim

United States Sentencing Guidelines § 3E1.1................10,11

United States Sentencing Guidelines § 4A1.1................54,55

United States Sentencing Guidelines § 5H1.6...................60

United States Sentencing Guidelines § 5K2.21..................45

United States Sentencing Guidelines § 6A1.3...................44

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

ALEX RUDAJ,                        :
NARDINO COLOTTI,
NIKOLA DEDAJ,                      :
PRENKA IVEZAJ,                          S3 04 Cr. 1110 (DLC)
LJUSA NUCULOVIC, and               :
ANGELO DIPIETRO,
                                   :
          Defendants.
                                   :
----------------------------------X
```

**GOVERNMENT'S SENTENCING MEMORANDUM**

The Government respectfully submits this Memorandum to apprise the Court of the Government's position with respect to various sentencing matters, and in opposition to the sentencing-related submissions of defendants Alex Rudaj, Nardino Colotti, Nikola Dedaj, Prenka Ivezaj, and Ljusa Nuculovic.  This submission is structured as follows: first, the Government responds to those arguments of defense counsel that affect more than one defendant; second, the Government responds to those defense arguments affecting individual defendants; and finally, the Government addresses, with respect to each defendant, the factors listed in 18 U.S.C. § 3553(a), in arguing that each defendant should be sentenced within the appropriately calculated Sentencing Guidelines range.  The Government relies on the Presentence Investigation Report for its general description of the Rudaj Organization and the various crimes of which the

1

defendants were convicted after trial.

I.   ISSUES ADDRESSED BY MULTIPLE DEFENDANTS

     A.   Enhancements Under the Extortion Guideline

          Section 2B3.2 of the U.S.S.G. applies to extortion
offenses and, as a result, is the applicable guideline for a
number of the racketeering acts and offenses of conviction in
this matter.  This guideline carries a base offense level of 18
and then provides for several possible enhancements based on
specific offense characteristics.  The defendants argue that a
number of the enhancements within the guidelines section are not
properly used in the calculation of the defendants' sentences in
this matter because each of the defendants has been convicted of,
and will be sentenced at the same time for, using and carrying a
firearm during and in furtherance of the racketeering offense, in
violation of Title 18, United States Code, Section 924(c).  (See
Rudaj Ltr. 14-15, 22; Colotti Ltr. 2 n.3; Dedaj Ltr. 12, 13, 15;
Ivezaj Ltr. 24; Nuculovic Ltr. 1-2, 5.)  In other words, the
defendants argue that, in light of the firearms conviction, the
application of certain enhancements would constitute
impermissible double-counting.  Specifically, the defendants
collectively argue that the following enhancements are subsumed
within, and superseded by, the firearms conviction: (1) the two-
level enhancement under U.S.S.G. § 2B3.2(b)(1) that applies if

2

the offense involved an express or implied threat of death,
bodily injury, or kidnapping; (2) the three-level enhancement
under U.S.S.G. § 2B3.2(b)(3)(B) that applies if the offense
involved, among other things, preparation to carry out a threat
of death or serious bodily injury, or if the participants in the
offense otherwise demonstrated the ability to carry out such a
threat; and (3) the enhancement under U.S.S.G. § 2B3.2(b)(4) that
applies if any victim sustained bodily injury.  For the following
reasons, the Government submits that the firearms conviction does
not cancel out the extortion guideline enhancement for implied
threat of bodily injury or the enhancement for actual bodily
injury.  In addition, the Government submits that the Court
should not apply to any of the extortion-related offenses or
racketeering acts in this matter the three-level enhancement for
preparation to carry out, or demonstration of the ability to
carry out, a threat of death or serious bodily injury.

        Section 2K2.4 of the U.S.S.G. is the guideline that
applies to firearms convictions under Title 18, United States
Code, Section 924(c).  Section 2K2.4(b) states, in relevant part,
that the guidelines sentence for a 924(c) firearms conviction is
the minimum term of imprisonment required by statute. U.S.S.G. §
2K2.4(b).  The application notes to Section 2K2.4 further
instruct that, where a sentence under Section 2K2.4 is imposed in

conjunction with a sentence for an underlying offense, the Court should "not apply any specific offense characteristic for possession, brandishing, use, or discharge of an explosive or firearm when determining the sentence for the underlying offense." U.S.S.G. § 2K2.4, Appl. n.4.  As explained in the application note, "[a] sentence under this guideline accounts for any explosive or weapon enhancement for the underlying offense of conviction, including any such enhancement that would apply based on conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct)."  There is no mention in the guideline or the application note that the sentence imposed for the 924(c) firearms conviction should substitute for any other specific offense characteristic set forth in the guidelines.

        In this matter, the defendants argue, without authority, that the imposition of a sentence for the 924(c) conviction should operate to preclude far more than just an enhancement based on the "possession, brandishing, use, or discharge of an explosive or firearm" as provided for in the application notes. U.S.S.G. § 2K2.4 Appl. n.4.  Instead, the defendants argue that the imposition of a sentence for the firearms conviction vitiates any enhancement in the guideline that is based on either a threat or violence, including the enhancement for an implied threat of death or bodily injury and

4

the enhancement for actual bodily injury.  Not only is there no authority for such a broad proposition, but the Guidelines themselves clearly do not contemplate that the imposition of a sentence for a 924(c) firearms conviction would operate in such a preclusive fashion.

Application note 4 of Section 2K2.4 specifically addresses and defines the preclusive effect of the imposition of a sentence for a 924(c) firearms conviction, and by its explicit terms, it only precludes an enhancement based on the "possession, brandishing, use, or discharge of an explosive or firearm." U.S.S.G. § 2K2.4 Appl. n.4.  Section 2B3.2 – the extortion guideline – includes a firearms enhancement that, by operation of section 2K2.4, cannot be applied to the extortion offenses in this matter, and here the Probation Department has appropriately declined to apply this enhancement in its calculation of the applicable sentencing range.  The other enhancements set forth within the guideline that do not specifically require the "possession, brandishing, use, or discharge of an explosive or firearm" are clearly not precluded by imposition of a sentence for the 924(c) firearms conviction and, where appropriate, should be applied.

We believe, however, that in the calculation of the guidelines for the racketeering offenses in this matter the Court

should not apply the three-level enhancement under U.S.S.G. §
2B3.2(b)(3)(B) for preparation or demonstration of ability to
carry out a threat of death or serious bodily injury.  Section
2B3.2(b)(3)(B) is inapplicable in cases where the firearms
enhancement set forth in Section 2B3.2(b)(3)(A) is applicable.
See U.S.S.G. § 2B3.2, Appl. n.6.  Section 2K2.4 Appl. n.4
effectively establishes that the imposition of a sentence for a
924(c) conviction serves as a substitute for the imposition of
the firearms enhancement under § 2B3.2(b)(3)(A).  Because the
924(c) conviction in this matter applies to the entire
racketeering and racketeering conspiracy offenses, we believe
that imposition of a sentence for a § 924(c) firearms conviction
precludes application of any of the enhancements under §
2B3.2(b)(3).

        Defendant Rudaj argues, with regard to the enhancement
for implied threat of death or bodily injury and the enhancement
for actual bodily injury, that application of the enhancements
should be precluded by imposition of a sentence for the 924(c)
firearms offense because "the device by which the defendants were
allegedly able to actualize the requisite 'force, violence, or
fear,' according to the government, was the persistent possession
of the firearms as charged in the 924(c) count."  (Rudaj Ltr. 14-
15).  This characterization gravely misstates the Government's

6

case against the defendants.  The Government presented
overwhelming evidence that the defendants, both as a group and
individually, regularly intimidated people and used violence
without using firearms.  While it is true that the defendants
regularly carried firearms, and at times actually used them, the
defendants employed many other means to intimidate people, such
as publicly beating people, threatening people, appearing
regularly in groups, and establishing their own identity as an
independent criminal organization, among other means.  In most
cases, these measures were sufficient without the use of firearms
to satisfy the requisite element of "force, violence, or fear"
that is a part of all extortions.

          Defendants Rudaj, Ivezaj, and Nuculovic argue that, for
each one of the extortion offenses, they should not be subject to
the two-level enhancement under U.S.S.G. § 2B3.2(b)(1) for
express or implied threat of death, bodily injury, or kidnapping.
In an argument that strains credibility, these defendants argue
that the facts of each of the extortion offenses do not include
such an implied or express threat.  For example, Ivezaj and
Nuculovic argue that no express or implied threats were ever made
to Antonios Balampanis or Foti Dimopoulos.  (Ivezaj Ltr. 23;
Nuculovic Ltr. 1).  Nonetheless, common sense dictates that
wrapped up in the vicious beating that Ivezaj and others

7

administered to Balampanis was a threat that bodily injury would
result should Balampanis, Dimopoulos, or anyone else, interfere
with the Rudaj Organization's takeover in Astoria.   Indeed, as
Ivezaj indicates in his submission, Balampanis specifically
testified that Dimopoulos believed that Balampanis' beating was
meant to "send a message" to Dimopoulos.   (Ivezaj Ltr. 23).   This
"message" obviously constituted a threat of bodily injury.
Ivezaj also argues that the events at Calda's Bar, and Ivezaj and
Nuculovic argue that the events of Cosmos Bar, did not include
threats of bodily injury because the only threats that were made
related to property.   (Ivezaj Ltr. 23; Nuculovic Ltr. 6.)   These
arguments conveniently overlook the circumstances of these
encounters.   In each case, the owner of the bar was confronted by
multiple physically-intimidating members of a criminal
organization who demanded that the owner permit the organization
to operate an illegal gambling machine on the premises.   In such
cases, the threat of physical harm is communicated loud and
clear, regardless of whether the specific words used related only
to the destruction of property.

In sum, the Government submits that, throughout the
PSR, the Probation Department has properly applied the two-level
enhancement under U.S.S.G. § 2B3.2(b)(1) that applies if the
offense involved an express or implied threat of death, bodily

injury, or kidnapping, and the enhancement under U.S.S.G. §
2B3.2(b)(4) that applies if any victim sustained bodily injury
(addressed in greater detail <u>infra</u>).  In addition, the Government
requests that the Court decline to employ the three-level
enhancement under U.S.S.G. § 2B3.2(b)(3)(B) that applies if the
offense involved, among other things, preparation to carry out a
threat of death or serious bodily injury, or if the participants
in the offense otherwise demonstrated the ability to carry out
such a threat.

    B.   <u>The Defendants Do Not Warrant A Two-Level Decrease
Based On Acceptance Of Responsibility With Respect To
The Gambling-Related Charges</u>

The defendants seek a two-level downward adjustment
based on their asserted acceptance of responsibility on Counts
Five and Six of the Indictment, charging them with operating, and
conspiring to operate, an illegal gambling business, in violation
of Title 18, United States Code, Sections 1955 and 371.  (Rudaj
Ltr. 8; Colotti Ltr. 2 n.2; Dedaj Ltr. 12).  As an initial
matter, this argument has no bearing on the defendants'
Sentencing Guidelines ranges, as the offense level for the
gambling-related counts (referred to in the PSR as "Group 1") is,
at its highest, 16; because that offense level is more than eight
levels less than the offense level for the highest group, Group 1
does not result in any additional units in the calculation of the

overall offense level.  In any event, the argument that the
defendants deserve a reduced offense level for the gambling
offenses is meritless.

Section 3E1.1 of the Sentencing Guidelines provides
that "[i]f the defendant clearly demonstrates acceptance of
responsibility for his offense, decrease the offense level by 2
levels."  Among the factors a court may consider in determining
whether a defendant has clearly accepted responsibility are
whether the defendant "truthfully admitt[ed] the conduct
comprising the offense(s) of conviction," whether the defendant
"truthfully admitt[ed] or [did] not falsely deny[] any additional
relevant conduct," and "the timeliness of the defendant's conduct
in manifesting the acceptance of responsibility." See U.S.S.G. §
3E1.1, Appl. n.1.  While not dispositive in demonstrating
acceptance of responsibility, entry of a guilty plea is
"significant evidence" that a defendant has indeed accepted
responsibility.  It is equally not a sine qua non: "[c]onviction
by trial . . . does not automatically preclude a defendant from
consideration for such a reduction." Id., Appl. n.2.
Nevertheless, only in "rare situations" does a defendant merit a
reduction for acceptance of responsibility after going to trial,
such as when, for example, he goes to trial to "make a
constitutional challenge to a statute" or to "challenge . . . the

10

applicability of a statute to his conduct." Id.  The Guidelines
further explain why it provides for reduction in offense level
when a defendant accepts responsibility for his offense: "The
reduction of offense level provided by this section recognizes
legitimate societal interests.  For several reasons, a defendant
who clearly demonstrates acceptance of responsibility for his
offense by taking, in a timely fashion the actions listed above
(or some equivalent action) is appropriately given a lower
offense level than a defendant who has not demonstrated
acceptance of responsibility."  Id., Appl. n.6.

         There is no basis to lower the defendants' offense
level for Group 1 based on concessions made by their lawyers
during the trial.  First, while as a general matter defendants
must plead guilty in order to merit a two-level reduction for
acceptance of responsibility, the defendants here, despite
whatever concessions their lawyers made at trial, did not even
seek to enter pleas of guilty to the gambling-related counts of
the Indictment (which the Court may or may not have agreed to
accept).  In addition, several courts of appeals, including the
Second Circuit, have held that a defendant is not entitled to an
adjustment for acceptance of responsibility when he has not pled
guilty to all crimes of which he was convicted.  See, e.g.,
United States v. Eng, 14 F.3d 165, 171 n.3 (2d Cir. 1994) ("We

note, . . . that adjustments for acceptance of responsibility
under Part E of Chapter Three are made only after the counts are
combined."); United States v. Ginn, 87 F.3d 367, 370-71 (9th
Cir. 1996); United States v. McDowell, 888 F.2d 285, 293 (3d Cir.
1989); United States v. Kleinebreil, 966 F.2d 945, 951-53 (5th
Cir. 1992).  These courts rely on the fact that Application Note
1(a) to Section 3E1.1 of the Guidelines requires that a defendant
"truthfully admit[] the offense(s) of conviction" before
receiving a two-level adjustment; the use of the plural
("offense(s)") suggests that the adjustment is appropriate only
for acceptance of responsibility as to all offenses of
conviction.  See, e.g., McDowell, 888 F.2d at 293 ("[The
Guidelines] does not contemplate calculating acceptance of
responsibility for each offense.").

        Second, the defense lawyers' concession of guilt was
hardly evidence of acceptance of responsibility, but rather
appeared to be a strategic decision intended to gain credibility
with the jury, attack the prosecution for overcharging, and avoid
convictions on the other counts of the Indictment.  This is clear
from the defense jury addresses.  See, e.g., Tr. 9445 (Rudaj
summation) ("this is a gambling conspiracy and not, not a
racketeering enterprise"); Tr. 9454 (Colotti summation)
(belittling the Government's evidence on the remaining counts by

pointing to the strength of the gambling evidence and noting the defense's concession on those counts); Tr. 9604 (Ivezaj summation) ("Who would think, how would anybody in this jury, being fair and reasonable people using your common sense, would [Ivezaj] think that he is getting involved in anything other than a gambling situation here?"); Tr. 9641 (Ivezaj summation) ("Now, we conceded the gambling, and I think that the prosecution is hoping that the gambling spills over into the other counts so that you will give more credit to their witnesses because of the fact that the gambling, they were accurate about the gambling.").

Third, while the defendants may have admitted in some fashion the factual elements of the gambling charges, their concession that they operated illegal gambling machines – a crime that was repeatedly belittled during defense addresses to the jury (see, e.g., Tr. 9610 (Ivezaj summation) ("A lot of people -- I don't know if you drive by Yonkers Raceway, but I think they're putting in 5,000 slot machines in Yonkers Raceway when they reopen.  So a lot of people don't consider gambling to be such a crime.") – came nowhere near covering the extent of the gambling crimes charged, which involved the defendants' involvement in bookmaking and gambling clubs; the defendants contested their involvement in these additional activities.  Furthermore, the defendants certainly did not concede the relationship between

13

these gambling crimes and the charged RICO enterprise, as would be required to accept responsibility for the racketeering act alleging the operation of an illegal gambling business.

Fourth, not all of the defendants who suggest they conceded their guilt as to the gambling offenses clearly maintained that position consistently during trial.  Counsel for defendant Dedaj emphasized during his opening that his client "with full awareness of the accusations made against him, . . . has pled not guilty and, . . . is presumed to be innocent," and predicted that at the end of the trial, the jury would find Dedaj "not guilty."  (Tr. 109).  More explicitly, counsel for Mr. Nuculovic suggested that at least a large number of the gambling machines at issue in this case were not illegal when he asked the Government's video gaming expert: "Well, in any time during the course of your -- educating yourself to become an expert, did you learn that Court of Appeals of the state of New York, which is the highest court in the state of New York, has determined that the Broadway machines are not gambling devices?" (Tr. 1055-56).

In the end, it cannot be said that any of the defendants truly accepted responsibility for their participation in the gambling offenses in this matter.  As a result, the motion for a reduction in offense level based on acceptance of responsibility should be denied.

14

C.    The PSRs Properly Group the Offenses of Conviction

Defendants Rudaj, Ivezaj, Colotti, and Dedaj assert
that the grouping analysis conducted by the Probation Department
was incorrect, and that certain of the extortion offenses and the
gambling offenses should be placed together into one group.
Specifically, defendants Rudaj and Ivezaj[1] argue that the
gambling offenses should be grouped with the
Dimopoulos/Balampanis extortion, the Soccer Fever extortion, and
the Cosmos extortion, because those three extortions were
committed for the purpose of facilitating the defendants'
gambling offenses, and therefore, presumably should not be in
separate groups.  (Rudaj Ltr. 15-16).  Alternatively, Rudaj and
Ivezaj argue that those extortion groups and the gambling group
should be consolidated into one group pursuant to U.S.S.G. §
3D1.2(b) because they all involve the same victim (the public at
large) and are part of a common scheme or plan.  (Rudaj Ltr. 15;
Ivezaj Ltr. 25).  Rudaj attempts to preemptively respond to the
fact that the defendants' extortion victims are readily
identifiable persons by attempting to define them as not "viable"
victims, because they supposedly had "nothing to surrender or

---

[1]  Defendant Colotti does not specifically address these issues
in his brief, but joins in the arguments of defendant Ivezaj
(Colotti Ltr. 2 n.1); defendant Dedaj also does not specifically
address these issues but joins in the arguments of co-counsel
(Dedaj Ltr. 15).

simply did not surrender anything."  (Rudaj Ltr. 15).  Similarly,
Ivezaj contends that the victims of the various extortions are
not real victims, because no restitution is sought on their
behalf.  (Ivezaj Ltr. 26).[2]

        The Probation Department properly conducted the
Guidelines grouping analysis, appropriately separating each
cluster of extortionate activity directed at a unique victim, as
well as the gambling offenses group, into separate groups.  The
defendants concede, as they must, that by the express language of
U.S.S.G. § 3D1.2(d), the different extortions should not be
grouped together because the extortion guideline section, §
2B3.2, is "specifically excluded" from the subsection authorizing
grouping. (See Rudaj Ltr. 14; Ivezaj Ltr. 25).  Nor is this a
case where any of the other subsections of § 3D1.2 operate to
render grouping appropriate.  The extortion and gambling offenses
as currently grouped do not involve the same victim or the same
act or transaction.  See U.S.S.G. § 3D1.2(a).  Instead, the
victim of the gambling offenses is society generally, and the
victims of the extortion groups attacked as victimless were fully

---

[2]  Finally, as a last resort, Rudaj urges the Court to reject the
Probation Department's grouping analysis because it overstates
the defendants' conduct.  (Rudaj Ltr. 16).  This argument can and
should be swiftly rejected, as there is no legal basis for the
Court to adopt an inaccurate grouping analysis on this (or any)
ground, and ample opportunity for the Court to consider whether a
properly-calculated Guidelines range provides a "reasonable"
sentence under United States v. Booker, 543 U.S. 220 (2005).

identified at trial: Dimopoulos and Balampanis were the victims
of the extortion charged in Racketeering Act 4, Hirakis, among
others, was a victim of the Soccer Fever extortion charged in
Racketeering Act 5, and Nicos Christoforou was the victim of the
Cosmos extortion charged in Racketeering Act 12.

This is simply not a case like United States v. Gelzer,
50 F.3d 1133 (2d Cir. 1995), cited by the defendants, where the
separate extortion groups were said to involve "substantially
identical offense conduct."  (Rudaj Ltr. 14).  Instead, each
extortion group, while fitting into the defendants' overall
enterprise pattern, charged different groupings of the defendants
and involved its own set of actions, resulting in different
demands, different threats, and different harms to the respective
victims.

The defendants' claim that the extortion victims
somehow disappear for grouping purposes because they were not
actually victimized is nonsense.  There is no requirement under
the Guidelines, as Rudaj seems to contend, that if an extortion
does not succeed in obtaining a legitimate property interest for
the defendants then the identifiable victim is ignored, and the
defendants' crime magically transforms into one against society
instead.  Nor is there any merit (or common sense) to Ivezaj's
argument that the fact that no restitution is owed means that

17

there were no victims.  Obviously, just because the defendants
either did not succeed in a particular extortion scheme, or
succeeded in extorting something for which restitution is not
appropriate (such as illegal proceeds), does not mean that the
crime does not have a victim for grouping purposes.

　　　　　Rudaj and Ivezaj further argue that the extortion
offenses should all be grouped together under U.S.S.G. §
3D1.2(c), because they had in common the use or threatened use of
a firearm, as was evident by the defendants' conviction for use
of a firearm in relation to a crime of violence, pursuant to 18
U.S.C. § 924(c).  Rudaj and Ivezaj are wrong.  The extortion
groups as constituted in the PSR do not "embod[y] conduct that is
treated as a specific offense characteristic in, or other
adjustment to, the guideline applicable to another of the
counts."  U.S.S.G. § 3D1.2(c).  Indeed, as the Government
addresses in greater detail above, the extortion calculations in
fact contain no enhancements that are due to the defendants' use
of weapons.  Accordingly, there is no overlap between the
specific offense characteristics of the extortion groups and the
18 U.S.C. § 924(c) count (which, in any case, is excluded from
the grouping analysis provided by the Probation Department).

　　　　　Ivezaj also argues for grouping of the extortion
offenses under § 3D1.2(c) because he received a role enhancement

18

on each group.  (Ivezaj Ltr. 26-27).  A role enhancement,
however, is not a "specific offense characteristic," see U.S.S.G.
§ 2B3.2(b), and is not the sort of conduct specific to one count
that falls under § 3D1.2(c)'s prohibition on double counting if
applied to more than one group.  See U.S.S.G. § 3D1.2, Comment.
n.5.  Instead, the addition of three levels for acting in a
supervisory role, as Ivezaj did, is appropriately added to each
group for which the enhancement is warranted.  See also infra.

> D.    The Court Should Adopt The Probation Department's
>       Calculation Of Enhancements Based On The Defendants'
>       Roles As Organizers, Leaders, Supervisors and Managers
>       Of Extensive Criminal Activity

Several defendants contest the enhancements that the
Probation Office has calculated for their "aggravating roles" in
the offense based on the fact that the particular racketeering
predicates at issue either did not involve five or more people,
or that the particular defendant at issue did not engage in a
supervisory role in that particular racketeering act.  (Ivezaj
Ltr. 18; Rudaj Ltr. 10; 3/27/06 Letter from DiPietro to
Probation, at 1).  The Government submits that in calculating the
aggravating role enhancement, the Court should consider the
defendant's position within the overall racketeering enterprise,
a position consistent with the decisions of several courts of
appeals.

In United States v. Damico, 99 F.3d 1431 (7th Cir.

1996), for example, the Seventh Circuit held that courts should look "to the count of conviction (the overall RICO conspiracy) and all relevant conduct" before imposing the adjustment for "aggravating role." Id. at 1437-38.  The Court rejected the defendant's approach, based on Application Note 1 to Section 2E1.1, to look at each individual predicate act, as "the predicate-by-predicate approach of Application Note 1 applies, as the note states, only for the purpose of establishing a RICO defendant's base offense level, and not for the purpose of applying the Chapter Three adjustments."  Id. at 1438; see also United States v. Yeager, 210 F.3d 1315, 1317 (11th Cir. 2000) ("it is appropriate to judge a RICO defendant's role in the offense with respect to the overall RICO conspiracy for the purpose of applying an enhancement under U.S.S.G. § 3B1.1(a)").  This position also makes sense, given that when a crime is committed in furtherance of a racketeering enterprise, it is not so much relevant for purposes of punishment that the defendant was a leader in the particular predicate act but rather that he was a leader in the overall enterprise.  For these reasons, the Court should not consider the defendants' leadership positions on a predicate-by-predicate basis, but rather base its determination on the defendant's overall position in the enterprise.[3]

---

[3]   In addition to this general request by several defendants to take a predicate-by-predicate approach, defendant Ivezaj contests

20

### E.   The PSR's Loss Enhancements Were Properly Calculated

Each defendant[4] argues that the PSR's calculation of loss amounts for the various extortions of which the defendants were convicted are improper, for two reasons: (1) loss amounts for certain of the extortions set forth in the PSR are not legally cognizable because they do not represent the amounts lost by the victims, but rather the amounts that the defendants expected to gain from the offenses; and (2) the figures set forth

---

the 3-level increase for his role as a "manager or supervisor" of the Rudaj Organization, on the basis that he was "only a salaried employee who took orders, and never received any of the Organization's profits or 'a piece of the action.'" (Ivezaj Ltr. 17-18).  Ivezaj also seeks a 3-level mitigating role because his conduct was "minor" as compared to his co-conspirators with respect to the gambling and extortion charges.  (Id. at 19). Apart from the fact that he cites the wrong standard for "minor" participants – which requires that the defendant's conduct pale in comparison to the average participant in such crimes, not his co-conspirators, United States v. Castano, 234 F.3d 111, 114 (2d Cir. 2000) – the portrait he seeks to paint of himself is simply inconsistent with the evidence at trial, including the testimony of Maurizio Sanginiti regarding Ivezaj's role at the Westchester gambling clubs (Tr. 1344), and the testimony of Nick Kyprianou regarding Ivezaj's role in collecting (and pocketing a portion of) protection payments in Astoria.  (Tr. 6624, 6628-29). Likewise, defendant Dedaj argues that he did not occupy a supervisory position either, but rather "was the individual in the Rudaj Organization who was responsible for repairing the machines."  (Dedaj Ltr. 11).  This assertion was refuted by the testimony of numerous witnesses who placed Dedaj as one of the top three leaders of the organization, including Kyprianou, who quoted Alex Rudaj as saying that Dedaj was the third highest-ranking member of the Rudaj Organization.  (Tr. 6609).

[4] Defendant DiPietro did not submit a sentencing memorandum to the Court, but in his objections to the PSR, he challenges the loss amount on the Mirage extortion as being unduly speculative.

in the PSR are speculative.  The defendants are wrong on both
counts.

>    1.    The PSR Loss Amounts Are Legally Sound.

>    Defendants complain that the PSR's extortion
enhancements pursuant to U.S.S.G. § 2B3.2(b)(2) are improperly
based not on loss to the victims, but instead on expected gain to
the defendants.  (Rudaj Ltr. 12-13; Ivezaj Ltr. 19-21; Nuculovic
Ltr. 2-3; Dedaj Ltr. 7-9).  The defendants' distinction between
the victims' loss and the defendants' gain is misplaced and
unsupported by legal authority.[5]

>    U.S.S.G. § 2B3.2(b)(2) states that "If the greater of
the amount demanded or the loss to the victim exceeded $10,000,
increase by the corresponding number of levels from the table in
§ 2B3.1(b)(7)."  That section, in turn, provides a table of
increases based on loss amount, and defines "loss" as "the value
of the property taken, damaged, or destroyed."  U.S.S.G. § 2B3.1,
Appl. n.3.  The focus of the guidelines is clearly directed at
establishing a fair value for the property that is the subject of
the extortion at the time of the extortionate conduct.  In cases

---

[5]  The defendants also argue that their sentences should not be
enhanced based on such racketeering acts as the Soccer Fever
extortion because the victims had no valid property right that
could have been obtained by the defendants.  (Ivezaj Ltr. 11).
As this Court held in response to the defendants' Rule 29 motion,
however, an illegal business opportunity is "property" for
purpose of the extortion statute, and should be so construed for
purposes of sentencing.

where the property in question is the subject of a completed extortion, as with some of the offenses in this case, an examination of the ultimate gain to the defendants may often be the only way to assess the fair value of the property in question. Indeed, the victim of a successful extortion no doubt finds it hard to establish the value of property that the victim no longer controls. As a result, common sense dictates that a fair assessment of the "amount demanded" or the "loss to the victim" or the "value of property taken" in an extortion case often and fairly requires the Court to examine the gain to the defendant and such an examination does not undermine the validity of the loss amount calculation.

2.   The PSR Loss Amounts Are Supported By The Record.

The Court need not find loss amount with precision, but instead may make a "reasonable estimate of the loss, given the available information." United States v. Carboni, 204 F.3d 39, 46 (2d Cir. 2000) (quoting United States v. Jacobs, 117 F.3d 82, 95 (2d Cir. 1997)). The main requirement is simply that the Court must not base its loss findings on "speculation" or "surmise and conjecture." United States v. Shonubi, 998 F.2d 84, 89-90 (2d Cir. 1993). The record in this case amply demonstrates that the amounts set forth in the PSR warrant the corresponding sentencing enhancements.

With respect to the Balampanis/Dimopoulos extortion, the defendants viciously beat Balampanis to force Dimopoulos and the Luchese LCN family to abandon their control of the Astoria gambling community – specifically, control of the lucrative barbout game, protection of the various card clubs and businesses in Astoria, the right to install and collect from illegal gambling machines, and the right to conduct loansharking activities within that community.  The defendants' plan worked, and the Rudaj Organization started earning many thousands of dollars a week from Astoria, reflecting the value of the property that the victim Dimopoulos lost as a result of the extortion.

The PSR calls for an enhancement of five levels to account for more than $1.5 million as the value of the Astoria gambling turf that the defendants extorted from their victims. There is little question that control of the Astoria gambling world was extremely lucrative.  In fact, the evidence at trial was that the Rudaj Organization made millions of dollars from the gambling machines in Astoria alone,[6] to say nothing of the other sources of their income including the lucrative barbout game, the collection of protection money, and the operation of a card club

---

[6]  Using a conservative estimate of 50 as the number of machines in Astoria (see Tr. 8114), multiplied by Kyprianou's conservative estimate of $750 a week that the Rudaj Organization made from the machines (Tr. 7340), results in a figure of almost $2 million a year.

and poker game by Nuculovic.

As the defendants would have it, the Court would have to disregard these facts and base its assessment of loss amount solely upon direct evidence of the lucrative nature of the business before the Rudaj Organization arrived in Astoria.  This is clearly not required.  Using clear and detailed evidence of the substantial profits obtained by the Rudaj Organization, the Court can fairly conclude that the value of control of the Astoria gambling community was worth at least $1.5 million to Dimopoulos and the Luchese Family at the time the organized crime turf was taken.  Indeed, as established by the evidence presented at trial, it is quite clear that the turf was worth far more than that conservative figure.

In connection with the Soccer Fever extortion, the Rudaj Organization protected its monopoly on the lucrative barbout gambling game, which generated thousands of dollars per night, by storming into Soccer Fever, shutting down that club and beating one of the club's partners, Mikhail Hirakis.  By their efforts, the Rudaj Organization shut down one competitor, and forced and intimidated other potential competitors into relinquishing any plans to open a barbout club in the area, thereby obtaining for themselves the ability to operate their barbout as a monopoly in Astoria.  This exclusivity was worth a

25

significant amount of money to the Rudaj Organization, and it
deprived the Soccer Fever victims of a significant amount of
money that, had the defendants not committed the extortion, the
victims would have been able to pursue.

The defendants argue that the Probation Department has
improperly calculated the value of the property taken at Soccer
Fever – which the PSR put at more than $800,000, adding four
levels as the appropriate Guideline enhancement.  However, the
evidence at trial established unequivocally that the operation of
a barbout game was itself worth such a significant sum of money.
To begin with, Mikhail Hirakis testified that, on the first night
of its operation, the Soccer Fever club earned approximately
$8,000.  (Tr. 5112).  Using $8,000 as a weekly figure, instead of
a daily figure as it was, the Soccer Fever barbout would still
have made more than $400,000 over the course of a year, thereby
demonstrating the substantial value of that barbout business.  No
doubt the $8,000 per night was conservative as the new barbout
would likely have grown as the business expanded its customer
base and established its presence.  The substantial value of the
Soccer Fever barbout is underscored by the lucrative nature of
the defendants' competing barbout at Skutarija.  Nicos Kyprianou,
who, under the FBI's direction, acted as a partner in Skutarija,
had access to the club's records.  He testified that in some

weeks the Rudaj Organization's club made as much as $66,000. (Tr. 7416).  As a result of these facts, it is undeniable that the value of the Soccer Fever barbout business exceeded $800,000 as found by the Probation Department.

In the Mirage extortion and the Misale extortion, the defendants demanded the same thing – a partnership in an ongoing business.  Putting aside for a moment the proper valuation of how much the defendants demanded from their extortion victims (i.e. how much the demanded partnerships or businesses were worth), there can be little question that the extortions of which these defendants were convicted did, in fact, involve such a demand. While the defendants may, and do, quibble with the valuations assigned by the Probation Office, they cannot credibly claim that a demand for a portion or the entirety of a business – which is what these attempted extortions were – is not a demand for something of value.  Moreover, that value was properly assessed by the Probation Department.

In the Mirage extortion, defendants Rudaj, Colotti, and DiPietro demanded from the owner of the Mirage an equal partnership in his topless nightclub.  In attempting to extort the owner of the Mirage, the defendants caused actual losses to the victims, as well as attempting to cause further losses and corresponding gains to themselves, through their demands to

27

become partners with the owner of the Mirage.  First, the
defendants sent certain individuals to the Mirage, a strip club
in the Bronx, for the purpose of causing disturbances.  During
the course of multiple visits, these individuals caused a
commotion, and even started a fight, resulting in the Mirage's
loss of business, and the loss of employees who quit because of
the fight, prompting the Mirage's owner to spend money on a
private security firm (Tr. 8230-33, 8242, 8283, 8293-96, 8335,
8340, 8343).  The individuals sent by the defendants also refused
to pay their bar bill at the Mirage, causing additional actual
monetary loss to the Mirage (Tr. 8236-37, 8287-88).  The
defendants then stepped in, offering to stop all of that trouble
for a partnership in the club.  (See GX 1270).  A 50% partnership
in a successful strip club obviously would be worth many
thousands of dollars, on top of the loss that the defendants
caused the Mirage owner by virtue of their extortionate
activities.  This makes the Probation Department's estimate of
$50,000 extremely reasonable, and it should be adopted by the
Court.

      In the Misale extortion, defendants Rudaj, Colotti, and
Dedaj demanded from Misale a partnership in his bar, the Puerta
Roja, without offering anything in exchange, other than, at
first, the forgiveness of a $3,000 debt (Tr. 2658, 2662).  While

the defendants claim that Misale was losing money at the bar and
that therefore the bar had no value, there can be no doubt that
the business had some value, otherwise the defendants would not
have been interested in it.  In any case, even if the business
were losing money, it still had value; it was an established
business with workers, a clientele, a lease, and a stock of
liquor, glasses, and other relevant supplies.  All of these
things were worth money.  But, in fact, the record is clear that
the business was not as unsuccessful as was portrayed by the
defendants; the business supported Misale, he was able to pay
employees such as a bartender and a bouncer (Tr. 2644, 2987), he
was able to supply the bar with liquor and other necessary
supplies (Tr. 2593), and was able to pay his lease.  For all of
these reasons, the Probation Department's estimate that a
partnership in the Puerta Roja was worth in excess of $10,000 is
highly reasonable.

        The defendants claim that no loss should be attributed
to Cosmos because during that extortion they merely replaced
another person's machine with their own, so that the Cosmos owner
did not lose anything pursuant to their extortionate behavior.
This argument ignores the difference between the owner's
relationship with the prior machine owner, which was entirely
consensual and negotiated, and the forcible interactions they had

29

with the owner, Mr. Christoforou.  What the defendants obtained
from their extortion was the money they improperly earned from
the gambling machine, which they had forced into his bar more
than a year before the machine was removed during the execution
of search warrants in this case.  (Tr. 5820).  Moreover, Mr.
Christoforou lost the ability to voluntarily contract for
entertainment machines, and Billy Schwartz (the owner of the
machines in Cosmos before the defendants put their machines in)
lost the income he earned from the machines.  (Tr. 5915).  The
figure estimated by the Probation Department – in excess of
$10,000 – is very conservative given the other, more generalized
evidence about how much the gambling machines earned.

      Similarly, a conservative and reasonable estimate of a
dollar figure for the amount demanded during the Calda's Bar
extortion is in excess of $10,000, as the Probation Department
found, given the trial evidence concerning the typical earnings
of the Rudaj Organization's gambling machines.

      At bottom, the defendants argue that the loss amount
cannot be exactly calculated, and then conclude that because it
cannot be exact, no loss figure calculation should be attempted.
But the law says differently; the Court need not reach anything
close to an exact calculation of the amount demanded or loss, and
the fact that the record is not amenable to a definitive answer

30

on that question does not mean that the correct answer is that nothing was demanded, as the defendants would have it.  The Court should adopt the loss amounts used in the PSR to enhance the defendants' Guideline calculations.

     F.     <u>The Court Should Apply Enhancements Based on the Bodily Injuries of Balampanis and Hirakis</u>

     The defendants argue against the bodily injury enhancements for the Dimopoulos/Balampanis extortion (four levels included in the PSR for "serious bodily injury"), and for the Soccer Fever extortion (the Government seeks six levels for "permanent bodily injury").

     1.    Balampanis's Injuries Were "Serious."[7]

     Defendant Ivezaj and other defendants contend that Balampanis did not suffer "serious bodily injury" within the definition supplied by the Guidelines, because despite being

---

[7]  As an initial matter, defendant Nuculovic argues that Balampanis is not a victim of the extortion because he did not own any gambling businesses in Astoria, and that therefore the defendants are not responsible for the serious bodily injury they inflicted upon Balampanis during their beating of him. (Nuculovic Ltr. 3).  Nuculovic misconstrues the law in so arguing.  The Guideline section requires an enhancement if "any victim" was injured.  U.S.S.G. § 2B3.2(b)(4).  Even if Balampanis were not the target of the extortionate demand, one can be a "victim" of an extortion without being the target of that extortion.  <u>See</u> <u>United States</u> v. <u>Hughes</u>, 211 F.3d 676, 691 (1st Cir. 2000) (holding that for purposes of the bodily injury enhancement, "victims" is broader than merely the target of the extortionate demand); <u>see also</u> <u>United States</u> v. <u>Molina</u>, 106 F.3d 1118, 1122 (2d Cir. 1997) (holding that in robbery context, mere bystanders injured during the course of a robbery are "victims" with respect to the bodily injury enhancement).

brutally beaten by five to seven men, Balampanis's injuries were
not serious enough to warrant that enhancement.  (Nuculovic Ltr.
3-4).  Guidelines Section 2B3.2 provides a series of enhancements
in the event an extortion victim has suffered some sort of bodily
injury, including: a six-level enhancement for "permanent or
life-threatening injury"; four levels for "serious bodily
injury"; and two levels for "bodily injury."  U.S.S.G. §
2B3.2(b)(4)(A)-(C).  The definition of "serious bodily injury" is
"injury involving extreme physical pain or the protracted
impairment of a function of a bodily member, organ, or mental
faculty; or requiring medical intervention such as surgery,
hospitalization, or physical rehabilitation."  U.S.S.G. § 1B1.1.
Appl. n.1(J).

          Balampanis suffered serious bodily injuries under the
applicable definition.  During his testimony, Balampanis stated
that:

> These people, they attack me, and I thought they want
> to kill me. . . . I took punches, kicking, kicked my
> head[] . . . you know, my face. . . It was very
> painful.  I couldn't – you know, they was beating me so
> much and so fast, everybody at the same time, I don't
> know exactly what happened. . . . I feel – it felt like
> somebody hit me with a pistol. . . . In my head. . . .
> I thought I [lost consciousness] . . . To me [the
> beating] felt like it was years.  It felt, you know –
> it felt very long. . . . They left me on the ground
> bleeding . . . I had – my eyes, they were swelling.  I
> had extreme pain in my head.  My jaw-way was swelling,
> bruises, cuts. . . . I was [bleeding] [f]rom my head,
> everywhere, my nose.  I had cuts on my face."

(Tr. 4217-18).  Following the beating, Balampanis testified that he called 911 for an ambulance, which came and took him to the emergency room.  (Tr. 4219-20).  Balampanis did not remember much of what happened in the hospital, but indicated that numerous tests were run, and that he was in the hospital for a few hours before being discharged.  (Tr. 4221).  Balampanis also indicated that because of the beating, he was bleeding "a lot."  (Tr. 4248).  Balampanis affirmed that he was beaten "really badly" (Tr. 4249) and "viciously" (Tr. 4277).  He testified that "[t]hey beat me up every single inch of my face," that he was "very serious[ly]" hurt (Tr. 4298), and that he told the ambulance personnel that he had been "pistol-whipped" (Tr. 4452).

The serious nature of Balampanis's injuries was corroborated by the testimony of Dr. Chuang, the emergency room physician who treated Balampanis following the beating (Tr. 4062-4123), as well as medical records, including GX 561 (an ambulance call report from the night of Balampanis's beating indicating head trauma, among other things), and GX 562A-E (hospital records from Balampanis's hospital visit, indicating Balampanis's injuries had been characterized as of medium severity (see Tr. 4070), that he was "punched, kicked, and pistol whipped," that he had vomited once, had dried blood around the nose (see Tr. 4072), had complained of a headache and had numerous areas of redness in

33

his face).   These injuries were also corroborated by Mikhail
Hirakis, who testified that in June or July of 2001, he saw
Balampanis, and said that Balampanis's "eyes were black, his lips
were swollen, and his face was very, very bad."  (Tr. 4580).
Hirakis indicated that it looked like "somebody had beaten him
up."  (Tr. 4584).

        Balampanis's injuries fall squarely within the
Guidelines definition of serious bodily injury, which, by the
wording of the applicable Guideline definition, requires proof of
one of the following: extreme physical pain, or the protracted
impairment of a function of a bodily member, organ, or mental
faculty, or requiring medical intervention such as surgery,
hospitalization, or physical rehabilitation.  See U.S.S.G. §
1B1.1, Appl. n.1(J).  Balampanis was brutally beaten by between
five and seven large men.  He did not even have an opportunity to
try to defend himself, much less fight back.  Balampanis
testified that he was in a great deal of pain (Tr. 4218 ("I had
extreme pain in my head."), that he thought the defendants were
going to kill him, that he was bleeding, that he was hit with a
firearm, that he felt like the beating lasted for "years" (Tr.
4218), and that he was left bleeding on the ground when the
defendants were finished brutalizing him.  (Tr. 4217-18).

        At a minimum, Balampanis's injuries should be

categorized as serious because of the "extreme physical pain" to which the defendants subjected him.  There can be no dispute that "extreme pain in my head" is exactly how Balampanis described himself following the beating.  (Tr. 4218).  And, indeed, the defendants were proud of how effectively they inflicted such extreme pain on Balampanis, as evident in the recordings concerning the Balampanis beating.  (See GX 1262 (Rudaj complaining that Balampanis's blood got on his white pants during the beating; Tr. 1569 (Sanginiti testimony about traveling to Astoria with defendants for beating, how he saw blood on Rudaj's pants, and how Ivezaj and DiPietro talked afterwards in car about how crazy it was, how Rudaj hit Balampanis with the barrel of a gun, and how Ivezaj complimented DiPietro on how good DiPietro kicked the guy with his knee)).

        In addition to the plain language of the Guidelines and ample support for the four-level enhancement in the record, at least one court in this District has applied a four-level enhancement for injuries remarkably similar to those suffered by Balampanis.  In Andres v. United States, No. 97 Civ. 3246 (AKH), 2001 WL 290053 (S.D.N.Y. March 26, 2001) (Hellerstein, J.), at *3, the court found that "[b]eing handcuffed, hogtied, kicked and threatened with death at gunpoint can reasonably be understood as involving extreme physical pain, and that, in turn, qualifies

35

under the Guidelines as 'serious bodily injury.'"

In this case, where the severity of the beating was readily established and the extreme pain suffered by the victim was unquestioned in the record, the four-level enhancement for serious bodily injury to Balampanis should be imposed.

2.    Hirakis Suffered Permanent Injuries.

The Soccer Fever extortion should include a six-level upward adjustment for the injuries sustained by Hirakis. The Sentencing Guidelines define "permanent or life-threatening bodily injury" as "injury involving a substantial risk of death; loss or substantial impairment of the function of a bodily member, organ, or mental faculty that is likely to be permanent; or an obvious disfigurement that is likely to be permanent . . . ."  U.S.S.G. § 1B1.1, Appl. n.1(J).  As the Fifth Circuit has noted, "[t]he plain language [of the definition] encompasses injuries that may not be terribly severe but are permanent, hence the disjunctive: 'permanent or life-threatening injuries.'" United States v. Price, 149 F.3d 352, 354 (5th Cir. 1998); see also United States v. Ramos, No. 01-14019, 130 Fed. Appx. 415, 420 (11th Cir. May 5, 2005) (the "permanency" of the victim's permanent scar on his lip "is sufficient to classify his injury as a permanent or life-threatening bodily injury").[8]

_____

[8] Under Rule 36-2 of the Rules of the United States Court of Appeals for the Eleventh Circuit, citation of unpublished

The standard is met here.  As Hirakis testified, the
beating at Soccer Fever resulted in the following:

> "My lips were swollen.  My nose was bleeding.  From
> here I had the blood running again. [indicating
> approximately the left temple area and on his left arm
> about midway between the wrist and the elbow] . . . My
> lips were swollen.  After I got conscious of the whole
> thing, I saw my lips swollen and my nose bleeding. . .
> . After the blow, I had problems. . . . I was getting
> dizzy very often.  I could not drink cold water.  That
> never happened to me before.  I could not eat ice
> cream, and when I was eating a spoonful of ice cream, I
> was getting dizzy."

(Tr. 4607-08).  Hirakis testified that a friend took him to the
hospital, where they wanted to admit him, but Hirakis refused.
(Tr. 4609-10).  Instead, approximately 14 hours later, Hirakis
went to see his doctor, Dr. Limbrakis.  (Tr. 4610).  Hirakis was
prescribed pain medication, and was ordered to get multiple MRIs
(Tr. 4611; see also GX 566).

Many of the physical problems Hirakis suffered from the
beating were permanent.  Specifically, Hirakis testified about
certain symptoms that lasted until the time of trial, more than
four years after the assault.  Hirakis testified that he
continues to get headaches, as well as dizziness.  (Tr. 4680-81).
These symptoms have affected Hirakis' daily life, as he has to
always carry aspirin with him (Tr. 4680), is unable to do

---

opinions is permissible as "persuasive authority," so long as a
"copy of the unpublished opinion is attached to or incorporated
within the brief, petition, motion or response in which such
citation is made."

construction work from an elevated position as he had done
previously (Tr. 4681 ("Above 10 feet I cannot work.")), and gets
dizzy and has vision problems when he eats cold foods or drinks
cold water (Tr. 4681).

Hirakis's injuries plainly qualifies as "permanent,"
and as the Eleventh Circuit found in Ramos, the "permanency" of
Zhang's injury alone "is sufficient to classify [it] as a
permanent or life-threatening bodily injury" under the
Guidelines.  United States v. Ramos, 130 Fed. Appx. at 420.
Moreover, Hirakis's injuries – the headaches, vertigo, and vision
problems – constitute a "substantial impairment of the function
of a bodily . . . organ," see U.S.S.G. § 1B1.1, Appl. n.1(J), and
are of the type severe enough for courts to consider "permanent
or life-threatening." See, e.g., United States v. May, 413 F.3d
841, 846 (8th Cir. 2005) (assault victim's headaches, memory
loss, depression, changed personality); Ramos, 130 Fed. Appx. at
420 (scar on forehead and permanent scar on lip); United States
v. Baggett, 342 F.3d 536, 539-40 (6th Cir. 2003) (fractured
finger, cracked tooth, substantial contusions and bruises, and
bleeding).

Moreover, it is not only the testimony of Hirakis that
supports a six-level enhancement.  Indeed, Hirakis's testimony on
this point was corroborated in numerous ways.  First, the

38

Government presented the testimony of Hirakis's medical doctor, who saw Hirakis mere hours after the beating.  Dr. Limbrakis testified that Hirakis presented with swelling, pain, and black and blue marks (Tr. 5330), and that after a thorough examination in which it became clear Hirakis had various problems as a result of the assault (see Tr. 5342-44), he diagnosed Hirakis with a TM joint derangement, a possible fracture of the left zygoma (cheekbone), and concussion syndrome.  (Tr. 5331).  Dr. Limbrakis further explained that concussion syndrome, such as Hirakis obtained from the beating, commonly results in problems with balance.  (Tr. 5335).  To ensure there was no blood in Hirakis's sinuses, which could cause extremely serious medical problems, Dr. Limbrakis ordered three MRIs, and gave Hirakis pain medication.  (Tr. 5335, 5348).  Dr. Limbrakis then described some of the problems that could ensue if a patient did not receive appropriate follow-up treatment, such as "lifelong" and "devastating" "headaches, dizziness, vertigo [and] frequent infections."  (Tr. 5349-50).  Hirakis's and Dr. Limbrakis's testimony concerning the extent of Hirakis's injuries were also corroborated by medical records.  (See GX 569 (Dr. Limbrakis's examination notes)).[9]

---

[9]  While present in this case and underscoring the appropriateness of the permanent injury enhancement, in fact corroborating evidence is not required for imposition of that enhancement.  See, e.g., Ramos, 130 Fed. Appx. at 420 (trial

Defendant Nuculovic argues against an injury enhancement for the Soccer Fever extortion based on the beating and pistol-whipping of Hirakis. Nuculovic claims, among other things, that the jury's acquittal on the assault in aid of racketeering charge connected to Soccer Fever means that the Court should find that Hirakis was not assaulted at Soccer Fever. (Nuculovic Ltr. 5). This is nonsense. First, the lower standard of proof applicable to sentencing issues means that Court clearly is not bound by the jury's verdict in determining whether Hirakis was assaulted. <u>See</u> <u>United States</u> v. <u>Garcia</u>, 413 F.3d 201, 220 n.15 (2d Cir. 2005). Second, as the defendants are well aware, the Assault in Aid of Racketeering jury charge with respect to Hirakis required the jury to find that Hirakis was assaulted with a <u>weapon</u>. (<u>See</u> Jury Charge at 85). Accordingly, the jury's acquittal on that count says nothing about the sufficiency of the evidence that Hirakis was beaten by defendant Dedaj during Soccer Fever, merely that the jury did not find beyond a reasonable doubt that the assault included a weapon. In fact, the evidence at trial was not completely clear on whether a weapon was used during the beating of Hirakis. While Hirakis testified that he

---

testimony of victim); <u>United States</u> v. <u>Baggett</u>, 342 F.3d at 539-40 (trial testimony of victim, corroborative testimony from lay witness who saw the injuries, and photographs of the injuries); <u>United States</u> v. <u>Hawkins</u>, 87 F.3d 722, 725-26 (5th Cir. 1996) (trial testimony of victim and photographs of injuries).

believed he was hit with a gun (which belief was supported by the
the testimony of Dr. Limbrakis and the relevant medical records
that Hirakis reported to Dr. Limbrakis the next day that he was
hit with a gun), at least one of the recordings put into evidence
indicated Hirakis may actually have been hit by a chair instead.
It is probable, therefore, that jury believed Hirakis's
testimony, including his testimony that he believed he was hit by
a gun, but given the recorded conversation indicating that the
object used may have been a chair, could not find the Assault in
Aid of Racketeering beyond a reasonable doubt.  In any case, what
cannot be seriously disputed is that Hirakis was badly beaten by
Dedaj in connection with the Soccer Fever extortion.[10]

        Indeed, the evidence that Hirakis was in fact beaten
during the Soccer Fever extortion is overwhelming.  Not only did
Hirakis testify about that beating in great detail over nearly
eight trial days of direct and cross examination (see, e.g., Tr.
4603-07), but he was corroborated in that testimony by other
witnesses, recordings (see GX 1217 (Hirakis asking Ivezaj why
Hirakis was beaten at Soccer Fever); GX 1254 (Nuculovic says he's

---

[10]  The Government has learned from Dawn Doino, the Probation
Officer responsible for three of the six defendants' PSRs, that
the reason she and the other Officer working on the reports did
not enhance the Soccer Fever extortion group for Hirakis's
injuries was because they (incorrectly) believed that the
acquittal on the Assault in Aid of Racketeering for Soccer Fever
foreclosed giving that enhancement.

proud of Soccer Fever and that no one got hurt "except Mike"); GX 1260 (defendants describing Soccer Fever extortion and beating of Hirakis)), the testimony of Hirakis's physician (Tr. 5327-5400), and medical records (GX 560 (record from Hirakis hospital visit on night of Soccer Fever incident); GX 569 (Limbrakis medical records of Hirakis injuries indicating Hirakis was beaten and hit by gun).

Accordingly, there is overwhelming evidence that Hirakis was assaulted during the Soccer Fever extortion, and that the assault caused permanent bodily injuries for which the defendants should be held responsible.

G.   Acquitted Conduct/Uncharged Conduct

A number of the defendants argue that the Court should not take into account acquitted conduct in imposing a sentence in this matter. See, e.g., Rudaj Ltr. 17-19.  This argument most obviously applies to the charges based on the attempted murder of Gaetano Peduto by Colotti and Rudaj, and the charge of violent assault in aid of racketeering against each one of the defendants based on the beating of Mikhail Hirakis at Soccer Fever.  While we do not ask the Court to use acquitted conduct in its calculation of the total offense level for each of these defendants, we submit that the Court can, and should, consider both acquitted conduct and uncharged conduct in connection with

the ultimate imposition of sentence in this matter.  Indeed, the Government submits that the Court can hardly overlook the astounding catalogue of violence and threats perpetrated by these defendants and proved by the Government at trial.

Section 1B1.3(a) of the Sentencing Guidelines provides that, in determining a defendant's base offense level, the District Court "shall" consider all "relevant conduct," which is defined, in relevant part, to include "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the offense of conviction [or] in preparation for that offense . . ." U.S.S.G. § 1B1.3(a)(1)(A); "all reasonably foreseeable acts and omissions of [any co-conspirators] in furtherance of the jointly undertaken criminal activity . . . that occurred during the offense of conviction [or] in preparation for that offense . . ." U.S.S.G. § 1B1.3(a)(1)(B); "all [such] acts and omissions [of the defendant or any co-conspirators] that were part of the same course of conduct or common scheme or plan as the offense of conviction" U.S.S.G. § 1B1.3(a)(2); "all harm that resulted from [such] acts and omissions [of the defendant or any co-conspirators], and all harm that was the object of such acts and omissions" U.S.S.G. § 1B1.3(a)(3) ; and "any other information specified in the

43

applicable guideline." U.S.S.G. § 1B1.3(a)(4).  Even "[c]onduct
that is not formally charged or is not an element of the offense
of conviction may enter into the determination of the applicable
guideline sentencing range." U.S.S.G. § 1B1.3, comment.  Facts
comprising relevant conduct for sentencing purposes must be
proven by a preponderance of the evidence. See, e.g., United
States v. Watts, 519 U.S. 148, 156-57 (1997) (per curiam);
McMillan v. Pennsylvania, 477 U.S. 79, 91, 106 S.Ct. 2411, 91
L.Ed.2d 67 (1986); United States v. Hazut, 140 F.3d 187, 190 (2d
Cir. 1998); United States v. Franklyn, 157 F.3d 90, 97 (2d Cir.
1998); see also U.S.S.G. § 6A1.3, comment (preponderance of the
evidence standard is appropriate for determining sentencing
facts); but see United States v. Booker, 543 U.S. 220, 251 (2005)
(jury must find beyond a reasonable doubt the existence of facts
that increase the applicable statutory maximum sentence).

It is firmly established that acquitted conduct, if
proven by a preponderance of the evidence, is properly considered
by the sentencing court in determining a defendant's relevant
conduct under the Guidelines and in fashioning an appropriate
sentence within the statutory range for the offense of
conviction.  See, e.g., Watts, 519 U.S. at 157; United States v.
SKW Metals & Alloys, Inc., 195 F.3d 83, 92 (2d Cir. 1999)
(remanding for resentencing where sentencing court misapprehended

its authority to consider acquitted conduct in determining sentence); see also U.S.S.G. § 5K2.21 (a Court may depart upward to reflect "the actual seriousness of the offense" based on conduct "that did not enter into the determination of the applicable guideline range").

The Second Circuit recently reiterated the principle that, even after the Supreme Court's decision in <u>United States</u> v. <u>Booker</u>, 125 S. Ct. 738 (2005), a district court may sentence a defendant taking into account acquitted conduct.  In <u>United States</u> v. <u>Vaughn</u>, 430 F.3d 518 (2d Cir. 2005), the jury found that the Government had proved beyond a reasonable doubt that the defendant's conduct involved at least fifty kilograms but not more than 100 kilograms of marijuana.  At sentencing, however, the district court found by a preponderance of the evidence that appellants' conduct involved 544 kilograms of marijuana and increased the defendant's Guidelines offense level.  Rejecting the defendant's contention that the sentence was contrary to the Supreme Court's decision in <u>Booker</u>, the Second Circuit stated:

> Before <u>Booker</u>, district courts calculated
> Guidelines ranges, within the statutory parameters
> authorized by the jury verdict, after determining
> facts relevant to sentencing by a preponderance of
> the evidence.  As we have stated recently and
> reiterate in this opinion, district courts remain
> statutorily obliged to calculate Guidelines ranges
> in the same manner as before <u>Booker</u> and to find
> facts relevant to sentencing by a preponderance of
> the evidence.  Consistent with that obligation,

45

> district courts may find facts relevant to
> sentencing by a preponderance of the evidence,
> even where the jury acquitted the defendant of
> that conduct, as long as the judge does not impose
> (1) a sentence in the belief that the Guidelines
> are mandatory, (2) a sentence that exceeds the
> statutory maximum authorized by the jury verdict,
> or (3) a mandatory minimum sentence under [21
> U.S.C.] § 841(b) not authorized by the verdict.

Vaughn, 430 F.3d at 526-27 (citing United States v. Garcia, 413

F.3d 201, 220 n.15 (2d Cir. 2005) and United States v. Crosby,

397 F.3d 103, 112 (2d Cir. 2005)); accord United States v.

Magallanez, 408 F.3d 672, 683-85 (10th Cir. 2005) (affirming

district court's decision not to accept the jury's special

verdict of drug quantity for purposes of sentencing, but instead

finding that a greater quantity was proved by the Government by a

preponderance of the evidence); United States v. Duncan, 400 F.3d

1297, 1304-05 (11th Cir. 2005) (holding that Booker does not

suggest that the consideration of acquitted conduct violates the

Sixth Amendment as long as the judge does not impose a sentence

that exceeds what is authorized by the jury verdict because "when

a trial judge exercises his discretion to select a specific

sentence within a defined range, the defendant has no right to a

jury determination of the facts that the judge deems relevant");

United States v. Ferby, 2005 WL 1544802 at **4-5 (W.D.N.Y. July

1, 2005) (sentence enhancement based upon acquitted conduct

created reasonable sentence which did not warrant resentencing).

In this matter, the Government submits that the Court should consider for purposes of sentencing both uncharged relevant conduct and acquitted conduct.  The Court should consider acquitted conduct because, at the trial of this matter, the Government proved by a preponderance of the evidence both the attempted murder of Gaetano Peduto, who was shot five times in head and back by Colotti and Rudaj (Tr. 3297-3300, 3397-3410), and the vicious beating with a weapon of Mikhail Hirakis, who was punched, hit over the head with a chair, and pistol-whipped by Dedaj and Ivezaj shortly after all of the defendants stormed Soccer Fever (Tr. 4605; GX 1213 at 12; GX 1217 at 17-18; GX 1254 at 6-7; GX 1260 at 11-13).

In addition, the Government proved numerous other acts of violence that were perpetrated by some or all of these defendants and should be considered by the Court in fashioning the defendants' sentences.  The following is a list of additional acts of violence, charged and uncharged, that were proven by the Government at the trial of this matter: (1) the beating of Salvatore Misale, who was set up for an extortion by Rudaj, and was beaten by Dedaj, Colotti, and others who punched him, gouged his eyes, bit his ear, and threatened him with a gun (Tr. 2679); (2) the beating of Antonios Balampanis, who was brutally beaten, punched, kicked, and pistol-whipped by all of the defendants,

47

except Colotti (Tr. 1569, 4217-76; GX 1262 at 25-26); (3) the
assault of Kostas Panzialis who was beaten by Dedaj for failing
to repay a loan and pay money from a gambling machine (Tr. 6557-
58; GX 1256-T at 3; GX 1257-T at 2); (4) the beating of Alan
Mabowitz, one of the owners of the Mirage topless nightclub, who
was punched in the face and "pummeled" during a fight instigated
by individuals sent by Rudaj and Colotti (Tr. 8340-41); (5) the
beating of Gaetano the Breadman who was beaten viciously by
Rudaj, Dedaj, and Ivezaj for being disrespectful and failing to
repay a loan (GX 1260-T at 8); (6) the beating of two La Cosa
Nostra soldiers from the Colombo and Bonanno crime families who
were beaten ruthlessly by Colotti, Ivezaj, Rudaj, and Dedaj in
broad daylight (GX 1261-T at 5-6; GX 1262 at 7); (7) the beating
by Dedaj and Ivezaj of an Arab gambling patron of an Astoria
gambling club that left blood splashed from wall to wall (Tr.
4960); (8) the beating of Pali, who pulled a gun on Dedaj and co-
defendant Gjelosh Lelcaj and was beaten so badly that Dedaj said
on a recorded conversation that Pali was probably in Jacobi
hospital (GX 1154-T); (9) the beating of a man who just got out
of prison and left a note after he robbed a gambling machine
belonging to Colotti and was beaten in Café Dion basement by
Colotti and Rudaj (Tr. 1428); (10) the beating by Rudaj and Dedaj
of three men at the Puerta Roja Bar who were bothering Salvatore

Misale and who Rudaj hit with his fists and threatened with a
gun, and Dedaj hit with cocktail table (Tr. 2644-53); (11) the
beating of an old man who owned the Cafe Roma in Port Chester by
Colotti, Rudaj, Dedaj, Ivezaj, and DiPietro, and whom Colotti
choked with a shoelace (Tr. 1572); (12) the beating of Johnny Joe
DiSpirito, a Bonanno soldier based in Pelham Bay in the Bronx,
who was "smacked around" by Rudaj, Colotti, Dedaj, and Ivezaj
(Tr. 1553); and (13) the beating of Joe Gambino, an old soldier
in the Gambino LCN family who was based on Arthur Avenue, was the
former boss of Colotti, and whom Colotti and Rudaj stripped and
threw into the street as a sign of disrespect and then kept his
wallet as a trophy (Tr. 1557).

        In addition, the Government proved at trial that there
were a number of other individuals who some or all of the
defendants sought to beat up in connection with the business of
the Rudaj Organization, including the following: (1) Foti
Dimopoulos, who fled Astoria after each of the defendants, except
Colotti, viciously beat his friend, Antonios Balampanis, in order
to send a message to Foti (Tr. 4224-26); (2) Tommy Napoli, a
Gambino LCN Family associate, who was the primary operator of the
Soccer Fever barbout club who the defendants intended to beat
when they stormed Soccer Fever and shut it down (Tr. 6883, GX
1254-T); (3) Frankie Flowers, an individual who ran a gambling

club in Poughkeepsie and who owed money to the Adee Street club, and was sought by Rudaj, Dedaj, and Ivezaj who came to meet him at Adee Street at which time Rudaj stated if Flowers had shown up, Rudaj going to tear him apart (Tr. 1394); and (4) the driver of a food truck who failed to repay $800 he borrowed from Rudaj at Skutarija, who was threatened by Rudaj, and about whom Rudaj stated, "You know what I'm going to do when I catch him?  I don't want the eight hundred dollars." (GX 1265, p. 3).

Finally, the Government proved at trial numerous incidents in which some or all of the defendants threatened or intimidated individuals in connection with the business of the Rudaj Organization, including the following individuals: (1) Lupe Silva-Hernandez, a bartender at Misale's bar, the Puerta Roja, who was screamed at by Dedaj and Little Nicky as they demanded the bar keys, until she called the police and then closed the bar for the night out of fear (Tr. 2995-3102); (2) all of the patrons of Soccer Fever to whom Rudaj said, if they come back, he will beat them one by one (Tr. 7051, GX 1260-T at 13); (3) Christos Vrahimes, the manager of the Grecian Cave who saw Nuculovic pull gun and put it on the table, and the waiter at the Grecian Cave who stepped back when Nuculovic pulled the gun (Tr. 4827; GX 1262-T at 18); (4) Antonios Custodio, the owner of Calda's Bar, and his wife who were confronted by DiPietro, Ivezaj, and Genua

50

and were told by DiPietro to get rid of existing gambling machine
and take a machine from the Rudaj Organization or he would have
problems (GX 1250-T at 11); (5) Peter Forchetti, John LeCourte,
Charles Figueroa, and all of the strippers and other employees at
the Mirage, many of whom quit, who were intimidated by Dominic
Rudaj, sent by Colotti and Rudaj to cause trouble at the Mirage
(GX 1270-T at 6-7, 61); (6) Nicos Christoforou, Patricia Zucker,
Billy Schwartz and Schwartz' bodyguard, each of whom were
intimidated in connection with the Cosmos Bar extortion (Tr.
5862-66); (7) Kypros Solomonidis, the 25-year-old waiter at the
Zodiac café, who borrowed money from Rudaj and was told by Rudaj
"I'll give you a beating right in front of the Zodiac.  I'll make
you look like a piece of shit," (GX 1260-T at 3-5), was lectured
by Rudaj with various stories of violence, and then was made to
feel Rudaj's shotgun wound (Tr. 6561-62; GX 1259-T at 8-9; GX
1265 at 2-7); (8) the various individuals who sided with
Nuculovic when the Rudaj Organization fractured, including John
Tirana, who was threatened by Dedaj outside of Skutarija until he
was shaking (Tr. 6861-63); Dimitri who Rudaj threatened not to
come into the Bronx or the Astoria clubs (GX 1260-T); and Galip,
who was threatened by Rudaj and Dedaj with a beating (Tr. 6961-
74, 7254); (9) Louie Nuculovic, who himself was confronted by
Rudaj, Dedaj, Colotti and others as the group sought to shut down

51

his competing barbout during the factional dispute (Tr. 7239-56);
(10) Lenny Colotti, whom Nuculovic discussed killing, and being
killed by, such that the FBI had to step in and give warnings to
prevent any violence, (Tr. 7305-10, 7331); (11) Arnold Squitieri,
the Acting Boss of the Gambino LCN family, who was confronted
with guns by various members or the organization at a New Jersey
gas station (Tr. 6698; GX 1262-T at 23-24; GX 1251 at 9-10); (12)
Joseph Caridi, the consigliere of the Lucchese LCN family, who
was told by Rudaj would be at war with the Rudaj organization if
he did not make a deal for Astoria (GX 1262-T at 16); (13) Vinnie
Artuso, a soldier in the Gambino LCN family, who was intimidated
by between 20 and 30 people, including Rudaj, Ivezaj, Colotti,
Dedaj, Nuculovic, DiPietro and others at social club in Arthur
Avenue in connection with a turf battle (Tr. 1451, 1486); (14)
the two Italian kids who tried to force machines into Skutarija
and were met and turned away by Rudaj, Colotti, Ivezaj, and
DiPietro (Tr. 1431); (15) the owner of Rao's Restaurant in
Manhattan who was confronted by Rudaj, Colotti, Ivezaj, Dedaj,
DiPietro, Nuculovic and 30 others in a dispute over a table that
signified status in the organized crime world (Tr. 1554; GX 1251-
T at 10); (16) the owner of Valbella's restaurant in Greenwich,
Connecticut who was visited by members of the Rudaj Organization
after he drove a Ferrari down Arthur Avenue and was later making

52

payments to the organization (Tr. 1516); (17) the owner of the Morris Park Inn in the Bronx, who was forced by Colotti, DiPietro, and Angelo Capalbo to take two gambling machines against his will (Tr. 1425); (18) numerous debtors who were late on making loanshark payments, including "Mikey Mush," who paid a sports debt after he was told he would have to meet with Rudaj, (Tr. 1454), Little Sal, who Ivezaj threatened to throw down the stairs at the Adee Street club if he was late in making payments (Tr. 1505); Little Tony, whose car Ivezaj seized because he was late on repaying a loan (Tr. 1507) (GX 120D); "Frankie Mutz," who Ivezaj threatened at Rockland County pizzeria because of late payments, (Tr. 1513); and Richie Signore, a Tuckahoe barber, who was given a message from DiPietro by DiPietro's son, that he would never open again if late on his payments (GX 1117); (19) Maurizio Sanginiti, who Colotti threatened with a beating in the basement of the Café Dion if he did not make good on his Ponce de Leon loan (Tr. 1430); and (20) Nicos Kyprianou, who was told by Ivezaj, even as Kyprianou wore a body wire, that nobody cooperates against Albanians because if you cooperate against an Albanian, even 100 years later, they will kill your family. (GX 1261-T).

This litany of violence and threats can only be described as shocking, depraved, and morally repugnant.  Without

doubt, the sheer volume of threats and violence perpetrated by these defendants in this matter demonstrates that each of the defendants were fully committed to using violence whenever necessary to further the interests of the Rudaj Organization, which of course was solely to make money through illegal means. These facts should be considered by the Court in fashion the sentences in this matter.

II.   ISSUES RELATED TO INDIVIDUAL DEFENDANTS

    A.   <u>Colotti Is Appropriately In Criminal History
        Category III</u>

Colotti argues that the Probation Office inappropriately added two points to his offense because he was on parole in 1991, pursuant to U.S.S.G. § 4A1.1(d).  (Colotti Ltr. 5).  Colotti argues primarily: (1) that the jury acquitted him of the attempted murder of Gaetano Peduto, the only racketeering act in the early 1990s; and (2) the Government's theory was that the Rudaj Organization began with the attempted murder of Gaetano Peduto.  These arguments are without merit.

Even setting aside the Peduto attempted murder (which, of course, the Court may consider regardless of the jury verdict), there was ample evidence that Colotti was heavily involved in illegal gambling in the early 1990s, as he owned several cafes that housed gambling machines, card games, and bookmaking.  Gaetano Peduto testified that he learned Colotti was

involved with these cafes when Peduto "was 16, 17, 18 [i.e. 1988,
1989, 1990], I don't remember exactly." (Tr. at 3345).  While
Racketeering Act One alleged that the defendant operated an
illegal gambling business beginning "in or about 1993," Colotti's
participation in these gambling cafes was certainly part of the
same course of conduct, that is, relevant conduct, both for the
RICO crimes and the stand-alone charges of operating, and
conspiracy to operate, an illegal gambling business.
See Application Note 4 to U.S.S.G § 4A1.1 ("Two points are added
if the defendant committed any part of the instant offense (i.e.
any relevant conduct) while under any criminal justice
sentence").  As such, because Colotti operated an illegal
gambling business while on parole, the Probation Department
accurately calculated his criminal history.

    B.   Ivezaj's Participation in Various Offenses

        Defendant Prenka Ivezaj argues for a lenient sentence
based on his self-serving assertion that the evidence in this
matter demonstrated no more than the fact that Ivezaj was merely
present for several of the offenses, including the beating of
Antonios Balampanis, the Calda's Bar attempted extortion, and the
Cosmos Bar extortion.  (Ivezaj Ltr. 9-10, 12-15).  Without going
into great detail, these assertions are totally inconsistent with
the record and with the conclusions of the jury that convicted

Ivezaj of each of these offenses.  In crafting his argument,
Ivezaj chooses to selectively feature portions of the evidence
while failing completely to address the volumes of evidence in
this matter that demonstrate that Ivezaj was a manager in the
illegal gambling operations of the Rudaj Organization and that
these operations were regularly expanded by members of the
organization, including Ivezaj, through extortionate conduct.  In
light of the volumes of evidence in this matter, it is clear that
Ivezaj's intent was to instill fear in various individuals to
obtain gambling territory in furtherance of the interests of the
Rudaj Organization.  As such, the Court should reject Ivezaj's
mere presence arguments.

III. DISCUSSION OF § 3553(A) FACTORS

        For the reasons explained below, there is no basis to
deviate from the applicable Guidelines Range in sentencing any of
the defendants.

    A. Defendant Rudaj

        Defendant Rudaj identifies several factors that he
believes warrant leniency in his sentence, including: (1) his
allegation that the grouping analysis proposed by the Probation
Department overstates the offense level (Rudaj Ltr. 21); (2) his
contention that the seven-year consecutive sentence based upon
the 924(c) firearms conviction results in an unduly harsh

sentence (Rudaj Ltr. 21-22); (3) his contention that his violent
character was exaggerated by the Government (Rudaj Br. 22-23);
and (4) his contention that his family will suffer as a result of
his extended incarceration (Rudaj at 23-24).

With respect to the grouping analysis, Rudaj contends
that "the heart of this trial was a gambling conspiracy which was
fed by extortionate activity which yielded additional gambling
activity" and that the resulting offense level "far exceeds the
combined severity of these crimes." (Rudaj Ltr. 21).  The
evidence presented by the Government at trial, however,
contradicts this mild characterization of Rudaj's offense
conduct.  As overwhelmingly demonstrated by the Government at
trial, this case was permeated to the core with acts of violence,
many of which Rudaj himself participated in and supervised.
Quite simply, at the heart of this matter was a group of
individuals whose unfettered greed was advanced by their complete
commitment to using threats, force, and violence to intimidate
people, to take property from others, and to expand their illegal
empire.  These facts justify a severe sentence that is, at a
minimum, consistent with the raw guidelines grouping calculation,
and Rudaj's blatant attempt to minimize his conduct is to no
avail.

Similarly, Rudaj's argument that the imposition of a

57

seven-year sentence for the § 924(c) conviction results in an
overly harsh sentence also fails.  Rudaj argues that the seven
year sentence results from conduct that is "already subsumed, at
least in a practical and intellectually honest sense, in the
extortion, loan sharking, and debt collection convictions."
(Rudaj Ltr. 22).  This argument completely overlooks the fact
that, as a result of the imposition of a sentence for the §
924(c) conviction, the defendant is subject to no guidelines
enhancement on any of the offenses for possession and use of a
firearm.  In this matter, the Government presented substantial
evidence that Rudaj regularly carried firearms and often used
them in connection with his offenses.  This specific conduct is
the basis of the § 924(c) conviction and is not reflected in the
Guidelines calculation in any way.  Indeed, as a result of
Rudaj's single § 924(c) conviction predicated upon the entire
course of the racketeering offenses, Rudaj has the good fortune
of having all of his episodes of firearms possessions subsumed
within a single 924(c) count and completely extracted from the
guidelines calculation in this matter.  As such, the resulting
sentence is not overstated and in fact is exactly what is called
for by the statute given the offense conduct in this matter.

        Rudaj also argues for a reduced sentence based on the
assertion that his violent nature was exaggerated by the

58

Government.  A quick review of virtually any portion of the
record dispels this argument and established that Rudaj did not
hesitate to use violence, used it often, and supervised a group
of individuals that were similarly committed to the use of
violence.  Indeed, given the evidence presented by the Government
at the trial of this matter, it would be hard to exaggerate
Rudaj's violence nature.

        Finally, in seeking a sentence below the otherwise-
applicable Guidelines range, defendant Rudaj cites to his family
circumstances, including the hardship imposed upon his wife and
children as a result of his offenses.  Rudaj, however, does not
present a compelling case for a reduced sentence based on his
family situation.  His family, who no doubt loves him a great
deal, does not present an unusual case, and is merely
representative of the harm is that all too often inflicted upon
family members by an individual who commits serious crimes.
Rudaj's family circumstances should not be a source of leniency.

    B.   Defendant Colotti

        Defendant Colotti points, essentially, to one factor
that he believes warrants a sentence below the applicable
Guidelines range: the terrible effects that his incarceration
will have on his children, with whom he is exceptionally close.
While Colotti does not seek a downward departure based on family

circumstances, he does cite several cases involving such a downward departure as instructive.  Nevertheless, the primary lesson to be learned from the Guidelines is that departures in this area should be rare, as the disruption to a defendant's family life is a terribly unfortunate, yet inevitable, consequence of a defendant's criminal activity.  See U.S.S.G. § 5H1.6 ("[f]amily ties and responsibilities are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range"); see also United States v. Tejeda, 146 F. 3d 84, 87 (2d Cir. 1997) ("Family circumstances are not a forbidden basis for a downward departure, but they 'are a discouraged basis for departure because the Commission has deemed them to be not generally relevant.'"); United States v. Londono, 76 F.3d 33, 35 (2d Cir. 1996) ("[d]isruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration"(internal quotation marks omitted).

As such, courts have generally limited departures to cases in which the defendant was the sole caregiver of another, or the defendant's family was uniquely dependent on him.  See, e.g., United States v. Johnson, 964 F.2d 124, 128-30 (2d Cir. 1992) (upholding departure when the defendant was the sole caretaker whose extraordinary parental responsibilities were

60

greater than those of an ordinary single parent because she was
the sole source of support for three young children, including an
infant, and of the young child of her institutionalized
daughter); United States v. Alba, 933 F.2d 1117, 1122 (2d Cir.
1991) (departure upheld where defendant's wife, two young
children, disabled father who needed help getting in and out of a
wheelchair, and grandmother were dependent on defendant for
economic and other support).  Of course, the Court's discretion
to grant a non-Guidelines deviation under Section 3553(a) factors
is greater than was available in these cases; nevertheless, the
Guidelines identification of cases that are unusual enough to
warrant leniency is certainly instructive.  And while the
defendant's relationship with his children appears to be very
close, that alone is not a sufficiently unusual circumstances to
justify deviating from the generally applicable Guidelines range.

    C.   Defendant Dedaj

        In seeking a sentence below the otherwise-applicable
Guidelines range, defendant Dedaj primarily cites to his family
circumstances, including his wife, four children and ill mother.
Like defendant Colotti, however, Dedaj does not present a
compelling case for a reduced sentence based on his family
situation.  His family, which is marked by a wife and children
who love him a great deal, is not unusual, and to the extent his

situation falls outside the norm, that is to his and his wife's credit but should not be a source of leniency.

In support for leniency, Dedaj does little more than minimize the seriousness of his offense, and at time glorifies it, by characterizing one vicious beating as "righting a wrong," and describing the attitude he had prior to his arrest generally as "Quixote-like." (Dedaj Ltr. 20). Dedaj minimizes, for example, the role he played in the offense, arguing that his "primary responsibility was the installation, servicing and repair of the gambling machines, as well as making the collections," while ignoring the overwhelming evidence that he was one of the three leaders of the organization and that he was in charge of the Organization's loansharking activities. See, e.g., Tr. 6609 (Kyprianou testifying that Rudaj said that Dedaj was the third in rank in the Organization, but that Dedaj was first in toughness). Dedaj also argues that he never personally used, carried or possessed a weapon, despite the testimony of Hirakis that everyone at Soccer Fever had a gun, and more saliently, Rudaj's comment in a tape-recorded conversation that he prefers that only one or two of his men carry weapons at a time, and that he likes it when Dedaj is one of them. (GX-1262-T, at 22 ("'One or two guys carry. God forbid the cops catch us because they put everybody with a fucking thing.' But me, I

love, I love to fucking carry, and having fucking Nicky carry
too.  Two guys . . .")).  Rudaj also stated during the same
recorded conversation, in recounting the stand-off with the
Gambino Family at the gas station, that Dedaj was the one that
pulled a gun, pointed it a gas pump, and threatened to blow the
gas station up.  Id. at 23.

     While defense counsel states that he knows "personally"
of the "overwhelming sense of remorse and guilt" that Dedaj feels
for his offenses, Dedaj's downplaying of his crimes and his role
in the Rudaj Organization and his characterization of his violent
actions (as motivated by an insult, in the case of the beating of
Kostas Panzialis, and a date rape in the case of the beating of
the "bread man") suggests that he has not truly recognized the
wrongfulness of his actions.  In its opening, the Government
characterized Dedaj as "the Organization's primary enforcer, the
one who could instill the greatest fear in the victims of the
Rudaj Organization and dispense the greatest violence." (Tr. 17).
The Government strongly believes that the evidence at trial bears
that characterization out.

     D.   Defendant Ivezaj

     Defendant Ivezaj identifies several factors that he
believes warrant leniency in his sentence: "1) his lifetime of
helping others, 2) his close family ties and the devastation that

63

his incarceration has caused to his close-knit family, particularly his aged mother, and 3) the fact that the approximately 21-year prison term calculated by the PSR would dramatically overstate the seriousness of [his] conduct, the essence of which was his participation in an illegal gambling enterprise, and the aberrant nature of the extortionate conduct for which [he] has been convicted."  (Ivezaj Ltr. 29).

With respect to his "good works," Ivezaj cites primarily to isolated incidents in which he helped others in need, ranging from the time that he helped a friend's fiancee fix her car to the times he drove another friend to visit that friend's mother in the hospital.  (Id. at 30).  While the Government certainly acknowledges that these were positive acts for the defendant to have undertaken, they do not demonstrate, as Ivezaj's submission suggests, "that, unless he has dual or split personalities, [Ivezaj] is not the kind of violent or callous person the government attempted to portray at trial."  (Ivezaj Ltr. 29).  The evidence at trial regarding Ivezaj's violent acts, including taped conversations in which he gleefully recounted prior violent acts, was overwhelming.  His sporadic good deeds cannot come close to mitigating the crimes of which he was convicted.

Likewise, the fact that Ivezaj comes from a large,

64

devoted family, whom he loves and who love him very much, hardly call out for leniency.  While many defendants who come before this Court for sentencing seek leniency on the basis that they are the sole breadwinner for their family, the same cannot be said of Ivezaj.  While his family may be severely hurt by his actions, it does not appear that anyone depends on him for actual support; as such, there is absolutely no basis to reduce his sentence due his family circumstances.

Similarly, Ivezaj's suggestion that his conduct was "aberrant" belies common sense.  Ivezaj was involved with the Rudaj Organization from as early as the Summer of 2001 until October 2004; during that time, he had constant involvement with the Organization and, in particular, the various gambling activities in which the Organization was involved; and he engaged in repeated and regular acts of violence on behalf of the Organization.  Ivezaj does not argue (nor could he) that his involvement in the Rudaj Organization was "aberrant" in the sense required for a downward departure because it was not short-lived; but even as a factor to be considered under Section 3553(a), there is absolutely no basis to believe that his regular criminal conduct over at least a three-year period can be said to "aberrant."

Finally, Ivezaj's argument that a Guidelines sentence

65

would create a disparity between his sentence and that of his co-defendants is without merit. The defendants to whom he cites include Gjelosh Lelcaj and Joseph Genua, as well as defendants who were convicted solely of operating a gambling business. All of these defendants were convicted after pleading guilty; all pled guilty to far less serious crimes; and none occupied the supervisory role or demonstrated the capacity for, and history of, violence that Ivezaj did. For all of these reasons, there is no basis to draw a comparison between the sentence Ivezaj anticipates receiving and the sentences already received by defendants who pled guilty prior to trial.[11]

E.   Defendants Nuculovic and DiPietro

Defendants Nuculovic and DiPietro do not make specific arguments in their submissions that the Court should sentence them below the applicable guidelines range. Nevertheless, it is

---

[11] Ivezaj also points to the seven-year sentence that Anthony Megale, the acting underboss of the Gambino Crime Family, recently received in the District of Connecticut. Of course, comparisons to isolated cases have limited value, because for every defendant who received a very lenient sentence there is one who received a very harsh sentence; such a spectrum is inevitable. More fundamentally, however, based on the press release that Ivezaj has provided, Megale's sentence does not appear to have been lenient, but rather differs from Ivezaj's in a number of important respects: first, Megale did not go to trial but rather pled guilty; second, Megale pled guilty to one count of racketeering conspiracy, which at least according to the press release, encompassed two extortions and a gambling charge; and third, and relatedly, while Megale's crimes no doubt involved implicit threats of violence, it does not appear from the press release that he admitted to actual violent acts.

apparent from the evidence presented by the Government at the trial of this matter that such a reduced sentence is not warranted for either of these defendants.

The evidence presented at trial demonstrated that Nuculovic participated frequently in acts of violence, including the assault of Balampanis, the storming of Soccer Fever, the armed gas station standoff with the Acting Boss of the Gambino Crime Family, and a nascent plot to kill co-defendant Lenny Colotti, among others.  In addition, the evidence demonstrated that Nuculovic's participation in criminal activity was not an occasional event but rather was a lifestyle that he had pursued for many years.  As a result, the circumstances of this case do not warrant a reduced sentence for Nuculovic.

Similarly, the evidence presented at trial demonstrated that DiPietro was also committed to a life of crime and had spent separate portions of his life in the criminal crews of a Luchese soldier and then a Gambino captain before enlisting with the Rudaj Organization.  Indeed, even when DiPietro was kicked out of the Rudaj Organization for stealing, he continued his illegal conduct by operating an illegal gambling club in Mount Vernon. In addition, the evidence showed that, while he was a member of the Rudaj Organization, DiPietro did not hesitate to use violence, as demonstrated by his participation in the Balampanis

67

assault and the storming of Soccer Fever.   As a result, the circumstances of this case do not warrant a reduced sentence for DiPietro.

<u>CONCLUSION</u>

For these reasons, the defendants should be sentenced as indicated above.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By:
    Timothy J. Treanor
    Jennifer G. Rodgers
    Benjamin Gruenstein
    Assistant United States Attorneys
    Tel. No.: (212)637-2362/2513/2315

68

AFFIRMATION OF SERVICE

JENNIFER G. RODGERS hereby affirms pursuant to Section 1746 of Title 28, United States Code:

1.   I am an Assistant United States Attorney in the office of Michael J. Garcia, United States Attorney for the Southern District of New York.

2.   On June 9, 2006, I caused a true and correct copy of the foregoing Government's Sentencing Memorandum to be served by Federal Express on the following counsel:

James Kousouros, Esq.
80-02 Kew Gardens Road
Suite 1030
Kew Gardens, New York 11415
Tel: (718) 575-5450
*Counsel for Alex Rudaj*

Joseph Tacopina, Esq.
Law Offices of Joseph Tacopina
275 Madison Avenue, 35th Floor
New York, New York 10016
Tel: (212) 227-8877
*Counsel for Nardino Colotti*

Roy R. Kulcsar, Esq.
389 Schraalenburgh Road
Haworth, New Jersey 07641
Tel: (201) 439-1455
*Counsel for Nikola Dedaj*

Richard A. Greenberg
Newman & Greenberg
950 Third Avenue
New York, New York 10022
Tel: (212) 308-7900
*Counsel for Prenka Ivezaj*

Robert Koppelman
585 West End Avenue
New York, New York 10024
Tel: (212) 577-6580
*Counsel for Ljusa Nuculovic*

Martin Geduldig
400 South Oyster Bay Road, Ste. 304
Hicksville, New York 11801
Tel: (516) 933-8474
*Counsel for Angelo DiPietro*

3.   I declare under penalty of perjury that the foregoing is
true and correct.  28 U.S.C. § 1746.

Dated:   New York, New York
         June 9, 2006

                                   _____
                                   JENNIFER G. RODGERS