```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                         :
UNITED STATES OF AMERICA,                :
                                         :
          -v-                            :
                                         :   04 Cr. 1110 (DLC)
ALEX RUDAJ,                              :
     a/k/a "Sandro Rudovic,"             :   OPINION & ORDER
     a/k/a "Uncle,"                      :
     a/k/a "Allie Boy,"                  :
NARDINO COLOTTI,                         :
     a/k/a "Leonardo,"                   :
     a/k/a "Lenny,"                      :
NIKOLA DEDAJ,                            :
     a/k/a "Big Nick,"                   :
     a/k/a "Nicky Nails,"                :
PRENKA IVEZAJ,                           :
     a/k/a "Frankie,"                    :
     a/k/a "Big Frank,"                  :
                                         :
                    Defendants.          :
                                         :
----------------------------------------X
```

Appearances:

For the Government:
Timothy Treanor
Jennifer G. Rodgers
Benjamin Gruenstein
Christina Bischoff
Sharon Cohen Levin
Assistant United States Attorneys
United States Attorney's Office for
the Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

For Defendant Alex Rudaj:
Herald Price Fahringer
Erica T. Dubno
Lipsitz, Green, Fahringer, Roll,
Salisbury, & Cambria LLP
780 Third Avenue, 32nd Floor
New York, NY 10017

For Defendant Nardino Colotti:
Joseph Tacopina
275 Madison Avenue, 35th Floor
New York, NY 10016

For Defendant Nikola Dedaj:
Roy Kulcsar
27 Union Square West
New York, NY 10003

For Defendant Prenka Ivezaj:
Richard A. Greenberg
Steven Y. Yurowitz
Newman & Greenberg
950 Third Avenue
New York, NY 10022

DENISE COTE, District Judge:

On June 16, 2006, these four defendants were sentenced in the above-captioned matter. The Court ordered the forfeiture of proceeds and property as part of the sentences and announced that a written opinion would follow to explain its decision regarding forfeiture. This is that Opinion.

Background

On September 12, 2005, a superceding indictment, Indictment S3 04 Cr. 1110 (DLC) (the "Indictment"), was returned with respect to fifteen defendants, including the four sentenced on June 16.[1] Counts One and Two of the Indictment charged these four defendants with violations of the RICO statute, 18 U.S.C. § 1962; Count Six charged all defendants with illegal gambling in violation of 18 U.S.C. § 1955; and Counts Twenty and Twenty-One charged defendant Alex Rudaj with bank fraud in violation of 18

---

[1] Unless noted otherwise, all references to "the defendants" in the remainder of the Opinion will refer only to the four defendants sentenced on June 16 and included in the caption above.

2

U.S.C. § 1344.[2]  The Indictment contained three forfeiture allegations relating to these five charges.

The first forfeiture allegation sought forfeiture of property related to the commission of the RICO violations. Specifically identified were (a) the defendants' interests in $5,755,000; (b) any interest of defendant Rudaj in 33-16 23d Avenue, Astoria, New York; and (c) any interest of defendant Nardino Colotti in 900 Morris Park Avenue, Bronx, New York.  The second forfeiture allegation sought forfeiture of property relating to the violation of the gambling statute.  Specifically identified were (a) $3,415,000, for which all defendants would be jointly and severally liable;[3] and (b) any interest of defendant Rudaj in 33-16 23d Avenue, the same property sought in the first allegation.  Finally, the third forfeiture allegation sought the forfeiture of two properties derived from the proceeds of defendant Rudaj's fraudulent conduct, (a) 625 Crescent Avenue, and (b) 836 Morris Park Avenue, both in Bronx, New York.[4]  The Government further announced its intention to seek substitute

---

[2] Several of the counts alleged in the indictment were later dismissed for lack of venue.  Counts Twenty and Twenty-One were then renumbered as Fourteen and Fifteen when the case was submitted to the jury.

[3] The Government did not argue in its later briefing that this amount represented an amount distinct from the $5,755,000 sought as RICO proceeds.  In keeping with the Government's approach, the Court ordered a single monetary forfeiture of $5,755,000 at sentencing.

[4] The Indictment describes these properties as being located in New York, New York, but the street addresses in fact describe locations in the Bronx.

assets in the event that any of the specifically identified assets could not be forfeited. Following a roughly three-month trial, a jury convicted the defendants of all of the counts described above.

Shortly before the case was given to the jury, defendants agreed to submit to the Court the determination of whether the requisite nexus existed between the properties sought for forfeiture and the charged criminal conduct. A schedule was set after the verdict was announced for the submission of briefs relating to forfeiture issues. The schedule was later extended at the request of defense counsel. Counsel for defendant Rudaj submitted a brief and counsel for defendant Colotti submitted a letter expressing his desire to join in the arguments made by Rudaj's counsel. No other defendant challenged the propriety of forfeiture. After reviewing all of the parties' submissions, the Court requested further briefing on a few limited issues, including whether a hearing should be held as requested by Rudaj. The Government and Rudaj each submitted briefs.

Rudaj had argued, <u>inter alia</u>, that he should receive a setoff against the forfeiture for his down payment and any capital improvements he made to the properties purchased with the proceeds of the bank fraud. He did not, however, submit any documentation or affidavit or other evidentiary support for his claim that improvements had in fact been made. The Court granted Rudaj a further opportunity to provide any relevant documentation. At a conference held on Tuesday, June 20 the parties agreed to attempt to resolve their dispute regarding the

size of any credit Rudaj would receive in relation to the bank fraud forfeiture. By June 22, the parties agreed that Rudaj would receive a credit of $262,613.40, thereby eliminating the last of the factual disputes between them. On June 30, the Government and Rudaj agreed to a stay of the order of forfeiture of the real property pending Rudaj's appeal of his conviction.

## Discussion

Rule 32.2, Fed. R. Crim. P., outlines the procedure for criminal forfeitures. After a verdict of guilty is returned on a count with respect to which the Government has sought criminal forfeiture, the court "must determine what property is subject to forfeiture under the applicable statute." Fed. R. Crim. P. 32.2(b)(1). When specific assets are sought, the court determines whether the Government "has established the requisite nexus between the property and the offense"; when a money judgment is sought, the court determines the appropriate amount of payment. Id. The issue of nexus for specific property may be submitted to the jury at the request of the defendant, id. at 32.2(b)(4), but all defendants in this case agreed to submit the issue to the Court. If the court finds that the property sought by the Government is subject to forfeiture, it must enter a preliminary order of forfeiture without regard to the interest of any third party in the property. Id. at 32.2(b)(2). The rights of third parties in specific assets may be considered at an ancillary proceeding that is not part of sentencing. Id. at 32.2(c).

A.  RICO Forfeiture

Criminal forfeiture is "an aspect of sentencing." Libretti v. United States, 516 U.S. 29, 49 (1995).  As with all fact-finding at sentencing, issues of fact relating to forfeiture must be established by a preponderance of the evidence. United States v. Bellomo, 176 F.3d 580, 595 (2d Cir. 1999); see also United States v. Fruchter, 411 F.3d 377, 384 (2d Cir. 2005) (same).

The RICO statute provides that a person convicted under Section 1962 "shall forfeit"

> (1) any interest the person has acquired or maintained in violation of Section 1962;
> (2) any interest in . . . or [] property or contractual right of any kind affording a source of influence over[ the RICO enterprise]; and
> (3) any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity.

18 U.S.C. § 1963(a).  Forfeiture under the RICO statute is mandatory. See United States v. Corrado, 227 F.3d 543, 552 (6th Cir. 2000).  In construing an identically worded statute, the Supreme Court explained that "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied." United States v. Monsanto, 491 U.S. 600, 607 (1989) (construing 21 U.S.C. § 853).

The Government is entitled to forfeiture of all proceeds and profits received as a result of racketeering activity. United States v. Robilotto, 828 F.2d 940, 948 (2d Cir. 1987).  Each defendant is jointly and severally liable for all foreseeable proceeds derived from the racketeering activity of the

6

enterprise. United States v. Edwards, 303 F.3d 606, 643-44 (5th Cir. 2002); see also United States v. Benevento, 836 F.2d 129, 130 (2d Cir. 1988) (imposing joint and several liability under 21 U.S.C. § 853).

Because forfeiture is imposed on a defendant in personam, the Government need not trace the proceeds to specific assets. Robilotto, 828 F.2d at 949. And because it is intended to be a potent means of punishment, the Government need not provide a precise calculation of the proceeds. See United States v. Lizza Industries, Inc., 775 F.2d 492, 498 (2d Cir. 1985) ("RICO does not require the prosecution to prove or the trial court to resolve complex computations, so as to ensure that a convicted racketeer is not deprived of a single farthing more than his criminal acts produced."). A total amount derived from "conservatively estimating" the revenue regularly collected or received will suffice where the evidence establishes the approximate amounts. Corrado, 227 F.3d at 555. But evidence regarding proceeds that is overly speculative will be insufficient to support a forfeiture award. Id. at 557-58.

Beyond proceeds of the enterprise, Section 1963(a)(2)(D) also authorizes the seizure of real property that afforded the convicted defendant influence over the RICO enterprise. "Properties that are owned by a RICO participant and used by him to further the affairs of a RICO enterprise afford the owner/participant a source of influence over the enterprise and are thus subject to forfeiture under 18 U.S.C. § 1963(a)(2)." United States v. Zielie, 734 F.2d 1447, 1459 (11th Cir. 1984);

United States v. Stern, 858 F.2d 1241, 1250 (7th Cir. 1988) (same). The use of a location to hold meetings related to the enterprise's business has been held to be a sufficient nexus to justify forfeiture. See United States v. Angiulo, 897 F.2d 1169, 1214-15 (1st Cir. 1990).

B. Gambling Forfeiture

Section 1955 of Title 18, which criminalizes certain gambling operations, further provides that "[a]ny property, including money, used in violation of the provisions of this section may be seized and forfeited to the United States." 18 U.S.C. § 1955(d). Previously, forfeiture was available in gambling cases only in civil in rem proceedings, see United States v. Conley, 826 F. Supp. 1533, 1535 (W.D. Pa. 1993), but that changed with the enactment of the Civil Asset Forfeiture Reform Act (CAFRA) of 2000, 18 U.S.C. § 2461. "Section 2461(c) . . . authorizes criminal forfeiture as a punishment for any act for which civil forfeiture is authorized, and allows the government to combine criminal conviction and criminal forfeiture in a consolidated proceeding." United States v. Razmilovic, 419 F.3d 134, 136 (2d Cir. 2005).

The version of Section 2461 in effect at the time the Indictment was returned provided that

> If a forfeiture of property is authorized in connection with a violation of an Act of Congress, and any person is charged in an indictment or information with such violation but no specific statutory provision is made for criminal forfeiture upon conviction, the Government may include the forfeiture in the indictment or information . . . and upon conviction, the court shall

8

order the forfeiture of the property . . . .

28 U.S.C. § 2461(c) (2000).[5]  Unlike civil proceedings directly under Section 1955, where the court has discretion to decline the Government's request for forfeiture, see United States v. 318 S. Third St., 988 F.2d 822, 828 (8th Cir. 1993), criminal forfeitures are mandatory under the terms of Section 2461(c).

C. Bank Fraud Forfeiture

Section 982 of Title 18 mandates forfeiture of property related to certain crimes against financial institutions, including bank fraud under Section 1344.  Specifically, the forfeiture statute provides that a sentencing court "shall order that the person forfeit . . . any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of" the fraudulent activity.  18 U.S.C. § 982(2).  An interest in real property purchased with the proceeds of a fraudulently obtained loan derives from the applicant's fraudulent activity.  See United States v. 874 Gartel Drive, 79 F.3d 918, 924 (9th Cir. 1996) (construing 18 U.S.C. § 981(a)(1)(C)).  There is conflicting authority over whether a defendant must forfeit his entire interest in a property purchased only in part with the proceeds of criminal activity.[6]

---

[5] Section 2461 was further amended in 2006.

[6] Compare United States v. Genova, 333 F.3d 750, 762 (7th Cir. 2003) ("[T]he ill-got gain is forfeited . . . , but value added independently by the accused is [not] a forfeitable gain . . . ."), and United States v. One 1980 Rolls Royce, 905 F.2d 89, 90(5th Cir. 1991) (construing 21 U.S.C. § 881(a)(6))

9

But there is universal agreement that at least the portion of the property that derives from proceeds of illegal activity is subject to forfeiture. The forfeiture statute does not entitle a defendant to a set-off for any part of a fraudulent loan that is repaid to the lender. United States v. Boulware, 384 F.3d 794, 813 (9th Cir. 2004).

D. Proceeds of Racketeering Activity

The Government seeks forfeiture of $5,755,000 as proceeds of the defendants' racketeering activity. The evidence presented at trial easily establishes that defendants accrued this much in the course of their racketeering activities. Cooperating witness Nikos Kyprianou testified that he knew from his observations of Astoria gambling clubs that the defendants controlled at least 35 illegal gambling machines in Queens. This number does not include machines operated in the Bronx, where seventeen machines were seized on October 26, 2004, or in Westchester County. Numerous witnesses testified that the defendants operated machines in both of these areas.

The Government estimates conservatively that each machine earned on average $750 a week. This estimate is supported by

---

(rejecting the Government's argument "that if one dollar of drug money was used to purchase an asset, the entire asset is forfeitable" and accepting defendant's claim that "the legitimate portions of the properties are not subject to forfeiture"), with United States v. 15603 85th Avenue North, 933 F.2d 976, 981-82 (11th Cir. 1991) (construing 21 U.S.C. § 881(a)(6)) ("[I]f one is a wrongdoer, the full value of the real property is forfeitable because some of the funds invested are traceable as the statute dictates.").

testimony of several witnesses who observed machines making anywhere from $1,200 to $7,000 a week, and a witness who stated that he would lose up to $1,000 in a single day on these machines. There was evidence that the defendants operated machines in some areas as early as the early 1990s, and that they took over gambling in Astoria from the Luchese organized crime family in 2001. The defendants controlled gambling in Astoria and collections from these machines until their arrests in this prosecution in October 2004.

Estimating, again conservatively, that the defendants operated fifty machines, each earning $750 a week, leads to weekly proceeds from gambling machines of $37,500. This number is well below the weekly earnings of $50,000 to $75,000 described by defendant Prenka Ivezaj in conversation with co-conspirator Maurizio Sanginiti. Annual earnings from the machines alone is thus estimated conservatively at $1,950,000 for at least three years. Beyond the gambling machines, moreover, the Government produced ample evidence that the defendants ran poker games that generated more money every week and since 2001, a very lucrative Greek dice game known as barbout, worth conservatively $25,000 a week or $1,300,000 a year. Taken as a whole, the evidence firmly supports the Government's claim to total proceeds of $5,755,000.

E. Real Property Forfeitures under RICO Statute

In addition to the proceeds of the racketeering activity, the Government also seeks forfeiture under the RICO statute of Rudaj's interest in 33-16 23rd Avenue, and Colotti's interest in

11

900 Morris Park Avenue. These properties are properly subject to forfeiture if they provided the defendants with a source of influence over the enterprise.

The property at 33-16 23rd Avenue, known as Skutarija, housed a gambling club. In addition to hosting the barbout game referred to above and gambling machines, the Rudaj Organization used Skutarija as its base of operations in Queens. The defendants used this location to conduct loansharking activities and store instrumentalities of their gambling and other criminal activities. A search of Skutarija led to the seizure of gambling-related documents, gambling machines, and several handguns. As a result, the property is subject to forfeiture under the RICO statute.

Rudaj argues that the forfeiture of Skutarija should be limited by the proportionality rule set out by the Second Circuit's decisions in <u>United States v. Porcelli</u>, 865 F.2d 1352, 1365 (2d Cir. 1989), and <u>United States v. McKeithen</u>, 822 F.2d 310, 315 (2d Cir. 1987). "Under this proportionality rule, proceeds or profits and property affording a source of influence are only subject to forfeiture to the extent they are tainted by the racketeering activity." <u>United States v. Angiulo</u>, 897 F.2d at 1211-12.

The Government contends that this proportionality rule was designed to accommodate Eighth Amendment concerns of excessive punishment, and that these decisions may no longer be good law following the Supreme Court's opinion in <u>United States v. Bajakajian</u>, 524 U.S. 321 (1998). This argument reflects a

misreading of Porcelli and McKeithen. In both opinions, the Second Circuit explicitly located the source of the proportionality requirement in the text of the forfeiture statutes themselves, rather than in the Eighth Amendment's prohibition of excessive fines. See McKeithen, 822 F.2d at 314-15 (looking to "the plain language of section 848(a)(2)(B)"); see also Porcelli, 865 F.2d at 1366 ("[F]orfeiture under section 1963(a)(2)(D) (regarding sources of influence over the RICO enterprise) must be limited by McKeithen's rule of proportionality."). Nothing in Bajakajian suggests that Congress could not impose a stricter proportionality requirement in a forfeiture statute than was constitutionally required.

Yet even though the statutory construction in Porcelli and McKeithen remains good law, Rudaj's proportionality argument is unavailing. Evidence presented at trial established that the entirety of Skutarija was used by the defendants to further the affairs of the enterprise: the front room held a gambling machine, the back room housed the barbout game, the office was used to run the gambling club and loansharking activities, and the storage room (or shed as the defendants attempted to characterize it at trial) was used for storage of gambling paraphernalia and guns. A straight proportionality analysis would consequently suggest that the entirety of Skutarija should be forfeited under Section 1963(a)(2)(D).

For largely the same reasons, the property is subject to forfeiture under the gambling statute as well. Real property may be seized under the gambling statute in a civil proceeding, see

318 S. Third St., 988 F.2d at 824 ("The language of the forfeiture provision is plain and clear: real property used in illegal gambling operations may be seized and forfeited."), and is therefore made subject to forfeiture in a criminal proceeding by Section 2461(c). See 28 U.S.C. § 2641(c); see also Razmilovic, 419 F.3d at 136.

Rudaj argues that Section 2461(c) may not be applied to him because it was amended in 2006 and the application of the current version of the statute would violate the Ex Post Facto Clause of the Constitution. See U.S. Const. art. I, § 9. The Government, however, does not contend that the amended version of Section 2461 should be applied to Rudaj; instead it correctly points out that the 2000 version provides for the forfeiture in criminal proceedings of any property that would be subject to forfeiture in civil proceedings under the gambling statute. See 28 U.S.C. 2461(c); Razmilovic, 419 F.3d at 136. As Rudaj does not contend that the property could not properly be forfeited in a civil proceeding, his argument that it cannot also be forfeited as part of sentencing must fail.

The trial evidence also established that the property at 900 Morris Park Avenue was used by the defendants to further the affairs of the Rudaj Organization. Salvatore Misale testified that he met with Colotti and Dedaj several times at Café Dion, located in this building, during which meetings he was threatened and assaulted in the course of the defendants' attempt to extort an ownership interest in Misale's Bar. Other evidence established that the defendants had used the basement of Café

14

Dion to administer beatings to other individuals in the course of their racketeering activities. The wallet of a well-known member of a major organized crime family was recovered from a search of the office in the basement of the building.[7]

F. Real Property Proceeds of Bank Fraud

The Government seeks forfeiture of two properties, 625 Crescent Avenue and 836 Morris Park Avenue, that were purchased in part with the proceeds of the fraudulent loans obtained by Rudaj. Rudaj does not dispute that the proceeds of the loans were applied to the purchase of these properties. There had been some dispute between the parties as to how much of Rudaj's interest in the properties derived from the proceeds of the fraudulent loan and how much of a credit he should receive for money put into the properties from other sources. That dispute has been resolved: the parties agree that Rudaj will receive a credit of $262,613.40, which reflects the amount of his down payments and expenditures on capital improvements for the two properties.[8]

---

[7] Significantly, the evidence presented at trial established only that the Café Dion (now Mamma Maria restaurant) and basement portions of the building provided a source of influence over the enterprise. Colotti has made no argument, however, that there are other portions of the building that were not used to further the affairs of the enterprise and that should therefore not be subject to forfeiture.

[8] Given the enormity of the forfeiture judgment and its concomitant right to reach substitute assets, the Government agreed to this resolution without prejudice to its legal position that Rudaj was not legally entitled to any credit.

15

Rudaj argues that the properties should not be forfeited because his misrepresentation to the bank was not material and that he never intended to harm the bank. The issues of materiality and whether Rudaj intended to expose the bank to risk of loss are questions of fact that were settled by the jury's decision to convict Rudaj of bank fraud. It is not relevant, moreover, that the bank has not come to any actual harm since the issuance of the loans or that Rudaj has made his mortgage payments. Compliance with the terms of a fraudulent loan does not entitle a convicted defendant to profit from his criminal activity by retaining possession of property acquired with the loan. Nor is Rudaj entitled to a setoff for the amount of these mortgage payments. <u>Boulware</u>, 384 F.3d at 813. The Government has agreed to give Rudaj a credit for the extent of his interest in the properties that derived from his separate untainted funds. The remainder of his interests derive from the proceeds of his criminal activity and are properly subject to forfeiture.

G. Eighth Amendment

In <u>United States v. Bajakajian</u>, 524 U.S. 321 (1998), the Court held that criminal forfeitures are punitive and subject to proportionality review under the Excessive Fines Clause of the Eighth Amendment. <u>Bajakajian</u>, 524 U.S. at 333-34. As a consequence, "[t]he amount of the forfeiture must bear some relationship to the gravity of the offense that it was designed to punish." <u>Id.</u> at 334. "[G]rossly disproportional" forfeitures are unconstitutional. <u>Id.</u> at 337.

16

The Supreme Court did not articulate a definition of gross disproportionality, but guidance may be found in the Court's analysis. Among the factors that the Court identified as relevant were (a) the defendant's level of culpability as reflected in the calculation of his Sentencing Guidelines range for imprisonment and fine; (b) whether the defendant fit into the class of persons for whom the statute was principally designed; (c) the maximum statutory sentence and fine that could have been imposed; and (d) the nature of the harm caused by the defendant's conduct. See id. at 338-39; United States v. Collado, 348 F.3d 323, 328 (2d Cir. 2003); see also Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 435 (2001) (noting that the Court's determinations of gross disproportionality "have focused on the same general criteria: the degree of the defendant's reprehensibility or culpability, the relationship between the penalty and the harm to the victim caused by the defendant's actions, and the sanctions imposed in other cases for comparable misconduct") (citation omitted).

Rudaj and Colotti ran this criminal enterprise. The essence of their crime was the direction and supervision of a substantial racketeering enterprise whose members extorted, assaulted, and intimidated anyone who did not bend to their will. They also ran an illegal gambling business for several years and Rudaj obtained two loans from a bank using fraudulent tax returns to make himself appear to be a better applicant than he truly was. As such, they fit perfectly into the class of persons for whom the RICO, gambling, and bank fraud statutes were designed. The

17

sentence and fine recommended by the Guidelines reflect their level of culpability and are substantial: 210-262 months of imprisonment and up to $1,000,000 for Rudaj; 234-293 months and up to $200,000 for Colotti. The statutory maxima are greater still: twenty years in jail for each RICO count, five for gambling, and thirty for each bank fraud. The maximum fine is up to twice the gross profits or proceeds of the racketeering or gambling activity. 18 U.S.C. §§ 1955, 1963(a), 3571(d). And finally, the nature of the harm reflected in their violation of the RICO and gambling statutes is truly grave. To acquire and hold gambling territory, the defendants used and threatened violence against not only rival criminal organizations but also owners of bars, restaurants, and nightclubs, and even gamblers. With gambling comes loansharking and violent debt collection. The victims of the defendants' criminal activity were many and varied.

Taking all of these four factors together, the forfeiture sought by the Government of $5,755,000 and three properties is not grossly disproportional to the gravity of the defendants' offense. The only factor that remotely tips in the defendants' favor is a comparison to the Guidelines fine. The amount of forfeiture sought here ($5.755 million, three properties from Rudaj, and one from Colotti) is undoubtedly larger than the Guidelines fine, but it is not "many orders of magnitude" larger. Bajakajian, 524 U.S. at 340. Each individual forfeiture allegation is well within the relevant statutory maximum fine. Rudaj estimates the value of the two bank fraud properties

18

together to be $1 million, while the statue would permit two fines of that size, one for each count of conviction. 18 U.S.C. § 1344. Similarly, the $5.755 million sought as RICO proceeds is half the statutory maximum of double the amount of proceeds or profits.[9]

With respect to the largest component of the forfeiture in this case, the $5,755,000 in proceeds, it is not even clear that requiring the forfeiture of illegally gotten gains could ever be considered an excessive fine. Bajakajian involved the forfeiture of property "involved in" the underlying offense, id. at 324, not the proceeds of illegal activity. Several courts of appeal concluded since Bajakajian that the forfeiture of proceeds, as opposed to legally acquired property later involved in a criminal offense, does not implicate Eighth Amendment concerns of disproportionality. See, e.g., United States v. Betancourt, 422 F.3d 240, 250 (5th Cir. 2005) (drug trafficking proceeds); United States v. 22 Santa Barbara Drive, 264 F.3d 860, 874-75 (9th Cir. 2001) ("Because criminal proceeds represent the paradigmatic example of 'guilty property,' the forfeiture of which has been traditionally regarded as non-punitive, we follow the Seventh, Eighth, and Tenth Circuits and hold that the excessive fines clause of the Eighth Amendment does not apply to a forfeiture

---

[9] Colotti did not put in any evidence regarding the value of 900 Morris Park Avenue, nor did he (or Rudaj) make an Eighth Amendment argument with respect to this property. Dedaj and Ivezaj have not argued that the imposition of a forfeiture of $5.755 million would violate the Excessive Fines Clause. If they had done so, that argument would fail.

19

action brought under 21 U.S.C. § 881(a)(6)."). But see Bajakajian, 524 U.S. at 333-34 ("It is . . . irrelevant whether respondent's currency is an instrumentality; the forfeiture is punitive, and the test for the excessiveness of a punitive forfeiture involves solely a proportionality determination."). It is not necessary for the purposes of this Opinion to reach this question. Assuming that a forfeiture of illegal proceeds could be an excessive fine under the Eighth Amendment, the forfeiture sought in this case certainly is not. There is no gross disproportionality between the forfeiture sought by the Government and the gravity of the defendants' conduct.

## Conclusion

Evidence presented at the trial amply supports the requisite nexus between the defendants' criminal conduct and the property sought for forfeiture. The evidence likewise supports the Government's identification of $5,755,000 as proceeds of RICO activity. The forfeiture is not grossly disproportional to the defendants' conduct and is therefore not an excessive fine prohibited by the Eighth Amendment. For these reasons, preliminary orders of forfeiture have issued.

SO ORDERED:

Dated:  New York, New York
        July 5, 2006

_____
DENISE COTE
United States District Judge